# STATE v. REINOR LILJA.[1]

April 20, 1923.

No. 23,410.

**Conviction for murder sustained.**

1. The evidence justified the verdict.

**When affidavits of jurors are admissible to disprove misconduct.**

2. Affidavits of jurors negativing charges of misconduct are admissible to support their verdict, but not to show that information obtained outside of court had no influence on their decision.

**Waiver of right to object to disqualification of juror.**

3. The right to object that a juror became disqualified by reading a newspaper article concerning the case may be waived; and where the defendant knows that such an article has been read by a juror, and thereafter proceeds with the trial to a final conclusion without objection, he waives his right to object.

**Public sentiment not so hostile as to prevent fair trial.**

4. The claim that public sentiment was so hostile to defendant that he could not have a fair trial is not justified by the record.

**Letter properly excluded.**

5. A letter to the deceased was correctly excluded because connected in no way with the commission of the crime or the one who committed it.

**Court's remark not prejudicial.**

6. The remark of the court in the charge that the various witnesses were in position to observe and know the facts to which they testified was not prejudicial.

Defendant was indicted by the grand jury of Chisago county charged with the crime of murder in the first degree, tried in the district court for that county before Searles, J., and a jury which found him guilty as charged in the indictment. From an order denying

[1] Reported in 193 N. W. 178.

his motion for a new trial and from an order denying his motion in arrest of judgment, defendant appealed. Affirmed.

W. E. Hewitt and Manley L. Fosseen, for appellant.

Clifford L. Hilton, Attorney General, G. A. Youngquist, Assistant Attorney General, and S. Bernhard Wennerberg, County Attorney, for respondent.

TAYLOR, C.

The defendant was convicted of the murder of Peter M. Carlson and appeals from an order denying a new trial.

Peter M. Carlson, 55 years of age and unmarried, lived on a farm near Center City in Chisago county. His father, 85 years of age, blind, bed-ridden, and partially deaf, lived with him. His mother was dead. Hannah Turnquist, a cousin, had lived in the Carlson home as a member of the family during her childhood, but had left the farm and for some years had been a professional nurse. In response to a letter from Peter, she came to the farm on April 9, 1921, to assist in caring for his father. These three constituted the household at the time of the murder.

On Sunday morning, April 17, 1921, Peter went to the barn to care for his stock. A little later, Hannah went to the father's room to care for him and prepare his breakfast, but found him asleep. Hearing some one at the door, she turned and was confronted by a man holding a revolver who wore a cap pulled down over his head and ears and a pair of amber colored automobile goggles which covered the upper part of his face. He ordered her to face the wall and put her hands behind her. She obeyed and he tied her hands behind her with a leather or rawhide thong. Compelling her to keep in front of him and lead him to Peter's room he made a search for money in that room and also in another room which Peter always kept locked, using a key which Peter had carried in his pocket to unlock it. When ready to leave, he removed the carbon connection from the telephone so it could not be used, untied Hannah's hands, told her that if she left the house in less than ten minutes she would be killed, that she would find Peter tied in the chicken house, and then backed out of the door and disappeared beyond the barn. Han-

nah waited a short time and then went to the chicken house but Peter was not there. She then went to the barn and called him, but did not find him nor receive any answer. She then hurried to the house of the nearest neighbor. He had a telephone and other neighbors and the sheriff at Center City were notified. The neighbors found Peter's body in the basement of the barn at the foot of the hay chute. He had been klled with a 32 caliber bullet. On the following Friday defendant was arrested in the city of Minneapolis and taken to the jail in the city of St. Paul. There he was placed with eight others dressed in a similar manner and about his age and size, and Hannah Turnquist was then taken to the room and requested to look at them. She identified defendant as the man who committed the robbery.

That Peter M. Carlson was murdered by some one is beyond question and was conceded. The state presented many facts and circumstances pointing to defendant as the person who committed the deed, in addition to his positive identification by Hannah Turnquist as the man who committed the robbery. Defendant testified that he was at his home in the city of Minneapolis at the time the murder was committed, and was corroborated in this by his mother and other witnesses. The state presented testimony that both he and his mother had made statements as to his whereabouts at that time which did not accord with their testimony at the trial. The record is lengthy and we deem a rehearsal of the evidence unnecessary. We have examined it carefully and find it sufficient to make the question of his guilt or innocence a question for the jury.

Defendant's principal contention is that he did not have a fair and impartial trial because of misconduct on the part of the jury, and because of prejudice existing against him at Center City, the place of the trial. Center City is a small village. The Minneapolis Evening Journal was kept for sale at a store in the village. Towards the latter part of the trial and while defendant was putting in his defense, this paper contained an article entitled: "Talk while asleep barred as evidence." The article stated that defendant was alleged to have made a confession while asleep, and that it had been ruled out on the ground that a confession can only be made by a person

in the full possession of his faculties and that a man asleep is not conscious. The paper was received at Center City in the evening. At the opening of court on the following morning, defendant's attorney called attention to the article. The court stated to the jury that his attention had been called to an article in the paper relating to what was claimed to have taken place in court on the trial, and asked if any of them had read it. One juror indicated that he had read it. The court stated:

"Of course that article that appears there was an entire misstatement. Nothing had occurred in this court that was reported to have occurred. My object is to caution you against reading that paper until after you are discharged from this. It is really a very serious contempt of court, but I have no idea that anyone connected with this trial is responsible. But to avoid any opportunity of your being prejudiced one way or the other, I want to caution you against it. (To the juror who read it) "You shouldn't communicate to the other members of the jury what you remember to have been contained in that article."

Defendant made no motion or suggestion of any kind, but at the conclusion of the court's remarks called a witness and proceeded with his evidence. On the motion for a new trial made after the return of the verdict he insisted that the reading of this article by one of the jurors was prejudicial misconduct entitling him to a new trial. Eleven of the jurors made an affidavit they did not read the article nor know anything of its purport until after the trial had been completed, and that it was not mentioned or referred to in any way during their deliberations. The juror who had read the article made an affidavit that he had read it; that he informed no other member of the jury of its contents; that it was not mentioned during the consideration of the case; and that after the court stated that it was not true he placed no reliance on it and dismissed it from his mind and did not permit it to enter into his decision. So far as they state facts and not inferences, affidavits of jurors are admissible to support their verdict, although not admissible to impeach it. State v. Lentz, 45 Minn. 177, 47 N. W. 720; 27 R. C. L. 899. But

this rule does not go to the extent of permitting jurors to prove by affidavit that prejudicial information obtained outside of court had no influence on their decison. Ann. Cas. 1913B, note at page 763; Aldrich v. Wetmore, 52 Minn. 164, 172, 53 N. W. 1072.

The affidavits were competent to prove that the article had been read by only one juror and that no reference had been made to it during the consideration of the case, but not to prove that it had no effect upon the juror who read it. The article did not state as a fact that defendant had made a confession in his sleep, but that he was alleged to have done so. The juror who read it of course knew that no such evidence had been offered or ruled upon in the presence of the jury, and his assertion that he gave no credence to it, after the statement made by the court, is probably correct, although not proof that such was the fact. However this may be, we think that defendant, by his conduct, waived the right to question the competency of the juror. Apparently satisfied with the action taken by the court, defendant, instead of making a motion or suggestion of any kind, called a witness and continued the presentation of his defense If he claimed that reading the article disqualified the juror, it was his duty to make his objection promptly after the fact became known to him. If he saw fit to proceed with the trial on the chance of obtaining a favorable verdict, he could not reserve this objection as a ground for setting aside the verdict if unfavorable. The right to object to jurors on the ground that they have become disqualified by reading newspaper articles is a right that may be waived. State v. Sackett, 39 Minn. 69, 38 N. W. 773; State v. Woodling, 53 Minn. 142, 54 N. W. 1068; State v. Williams, 96 Minn. 351, 105 N. W. 265; State v. Briggs, 122 Minn. 493, 504, 142 N. W. 823; State v. Minneapolis Milk Co. 124 Minn. 34, 144 N. W. 417, 51 L. R. A. (N. S.) 244; In re Belt, 159 U. S. 95, 40 L. ed. 88; Marrin v. U. S. 167 Fed. 951, 93 C. C. A. 351; James v. Bowen, 83 Conn. 702, 78 Atl. 420; Busse v. Barr, 132 Iowa, 463, 109 N. W. 920; Bulliner v. People, 95 Ill. 394; Hunter v. State, 43 Ga. 483, 524; People v. McCoy, 71 Cal. 395, 12 Pac. 272; Commonwealth v. Clay, 56 Pa. Super. Ct. 427; McCue's Case, 103 Va. 870, 49 S. E. 623; Hack v. State, 141 Wis. 346, 124 N. W. 492, 45 L. R. A. (N. S.) 664; Oborn v. State,

143 Wis. 249, 126 N. W. 737, 31 L. R. A. (N. S.) 966.  By proceeding with the trial to a final conclusion without objection and with full knowledge of the facts, defendant waived whatever right he may have had to challenge the competency of the jurors.

The claim that such a prejudice existed against defendant at Center City that he could not have a fair trial at that place is based on a single affidavit that people in that community freely and generally expressed the opinion that he was guilty.  This was met by affidavits to the effect that there was no decided sentiment either for or against the defendant, and that the opinions expressed were divided and only such as are usually heard during a trial of that nature. There is no claim of any public demonstration of any kind, nor of any manifestation of hostility or ill-will toward defendant.  We find no basis for the claim that he did not have a fair and impartial trial because of prejudice existing against him.

A letter to Peter from Ray Anderson, a cousin, written at Minneapolis April 15, was received at the post-office at Center City the day after Peter's death.  In this letter Anderson wrote that he had found where he could get genuine grain alcohol in 5 gallon cans at $220 a can, that Peter would have to take 5 gallons if he wanted any, because he, Anderson, did not have the money to get it himself, and asked Peter to write whether he wanted it.  Defendant insisted that the court erred in excluding this letter, and testimony that a large number of empty bottles were found on the farm.  The ruling was correct.  There was nothing tending to connect the letter, these bottles or the writer of the letter with anything that occurred in connection with the murder nor with any one concerned in its commission.  The only claim is that this letter and the presence of these bottles on the premises might lead the jury to doubt whether the crime was not committed by some "bootlegger" instead of defendant.  These facts, without more, would not justify an inference that the person who committed the crime was connected with the illegal liquor traffic.

In the charge the court stated that the testimony was conflicting and that the jury in weighing it should take into account the various considerations that would influence a person in testifying, and that this would apply to the nurse.  He then said:

"Of course, the value of any witnesses' testimony would be dependent on the opportunity they had for observation, but, as I recall the testimony, the various witnesses were in a position to know what they testified to. There isn't much chance for doubting their ability to observe as to the facts concerning which they have given evidence."

This is challenged as vouching for the ability of Hannah Turnquist to observe and identify the robber, although his hair and ears were concealed by his cap and the upper part of his face was covered by automobile goggles with side pieces attached. The statement was general, applying to all witnesses on both sides. It was not positive, yet it was to the effect that in the opinion of the court the several witnesses were in a position to observe the facts to which they testified. No objection was made to this statement at the trial and it appears to have been substantially correct. The only evidence as to the personal appearance, mode of dress and partial disguise of the robber is the testimony of the witness Hannah Turnquist. She described these matters in detail, and that she was in position to observe them is not questioned. The real contention is that the court's statement would cause the jury to give undue weight to her identification of defendant as the robber. We do not think so. It did not apply to her any more than to the other witnesses, and we are satisfied that it had no prejudicial effect.

Defendant's requests, insofar as they were proper, were sufficiently covered by the general charge. The order appealed from is affirmed.