Lloyd H. OSSENFORT, by Eleanor M. Ossenfort, His Guardian Ad Litem, and Eleanor M. Ossenfort, Individually, and as Husband and Wife, Respondents,

Nobles County Welfare Board, Respondent,

v.

ASSOCIATED MILK PRODUCERS, INCORPORATED, Appellant-Respondent.

and

Clifford VIESSMAN, et al., defendants and third party plaintiffs, Respondents-Appellants,

v.

Arthur G. DRENTH, third party defendant, Respondent.

Nos. 46428, 46440.

Supreme Court of Minnesota.

May 20, 1977.

Richard D. Allen, Minneapolis, for Assoc. Milk Prod.

Brecht, Hedeen & Hughes, Worthington, for Viessman et al.

Grose, Von Holtum, Von Holtum, Sieben & Schmidt, Clint Grose and David Stofferahn, Minneapolis, for Ossenfort.

Harris Darling, County Atty., Worthington, for Nobles Co. Wel. Bd.

Erickson, Zierke, Kuderer, Myster & Wilhelm and Charles R. Zierke, Fairmont, for Drenth.

PETERSON, Justice.

These are consolidated appeals from judgment for plaintiffs following a jury verdict for $1,500,000 damages in a personal injury action and from denial of defendants' motions for a new trial. We affirm.

Plaintiff Lloyd Ossenfort suffered organic brain damage and was rendered a spastic quadriplegic when a pickup truck in which he was a passenger collided with a bulk milk hauling truck at a controlled highway intersection on October 28, 1971. The milk truck was driven by defendant Gary Fehl, owned by defendant Clifford Viessman, and used in performance of Viessman's contract with defendant Associated Milk Producers, Incorporated (AMPI), to haul milk from farmer-producers in the Worthington, Minnesota, area who sold milk to AMPI. The collision occurred when defendant Fehl admittedly failed to stop at a stop sign which controls Nobles County Road No. 14, the road on which he was driving, where it intersects with Minnesota Highway No. 91, the road on which plaintiff Lloyd Ossenfort was traveling. Viessman and Fehl brought an action as third-party plaintiffs alleging negligence on the part of third-party defendant Arthur Drenth, driver of the pickup truck in which Ossenfort was riding.

The jury, by special verdict, found Fehl 100 percent negligent, exonerating Drenth of contributory negligence, a finding not now contested by Fehl. It found that Viessman was an employee of AMPI, thereby rejecting AMPI's argument that Viessman was an independent contractor. The jury awarded Ossenfort $1,000,000 and Eleanor Ossenfort, his wife, $500,000. The court ordered judgment in those amounts against Fehl, Viessman, and AMPI.

Individually or together, AMPI, Viessman, and Fehl assign numerous errors on

appeal, including: Failure to direct a verdict in AMPI's favor on the grounds that Viessman was an independent contractor and not an employee of AMPI and, a fortiori, that Fehl was not an employee of AMPI; refusal to compel discovery under Rule 26.-02, Rules of Civil Procedure; refusal to allow an adverse medical examination after commencement of trial; admission of an economist's testimony on the effect of inflation in computing future damages; excessive award of damages; and prejudicial misconduct of the jury or bailiff.

 1. The first issue, central to AMPI's defense of this case, involves the relationship between AMPI and Viessman. The jury found that an employer-employee relationship existed between them, so that AMPI was vicariously liable for the negligence of Viessman and Viessman's truck driver, Fehl. AMPI had moved for a directed verdict at the close of plaintiffs' evidence on the grounds that plaintiffs had failed to raise a jury question as to that relationship; and at the close of all the evidence, AMPI again moved for a directed verdict, on the grounds that Viessman was an independent contractor. The court denied both motions. In deciding whether a motion for a directed verdict was properly denied, we consider all the evidence, including that introduced after denial of the first motion. See, *In re Welfare of Fish,* 288 Minn. 512, 179 N.W.2d 175 (1970). We hold that the evidence as a whole was sufficient to raise a jury question as to the employment relationship of Viessman and AMPI, and that the trial court did not err in denying either motion.

 The most frequently cited test for distinguishing an independent contractor from an employee derives from *Guhlke v. Roberts Truck Lines,* 268 Minn. 141, 143, 128 N.W.2d 324, 326 (1964), where we said:

" * * * It is conceded that the factors applied in testing the relationship are: (1) The right to control the means

and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge. In determining whether the status is one of employee or independent contractor, *the most important factor considered in light of the nature of the work involved is the right of the employer to control the means and manner of performance.*" (Italics supplied.)

In *Corbin v. Commissioner of Revenue,* Minn., 240 N.W.2d 809, 812 (1976), we reiterated the importance of the "control" factor,[1] citing *Frankle v. Twedt,* 234 Minn. 42, 47, 47 N.W.2d 482, 487 (1951), which described the kind of "control" characteristic of an employer-employee relationship as distinguished from that characteristic of independent-contractor status:

" * * * The determinative right of control is not merely over *what* is to be done, but primarily over *how* it is to be done. Basically, it is the distinction between a person who is subject to orders as to *how* he does his work and one who agrees only to do the work in his own way."

 The issue of employment status is one of fact. *Hagberg v. Colonial & Pacific Frigidways, Inc.,* 279 Minn. 396, 157 N.W.2d 33 (1968). It is for the trier of fact to distinguish between the "right-to-control" characteristic of an employer-employee relationship and the fact of powerful influence not inconsistent with an independent-contractor relationship. Our function on appeal is to determine whether its finding may reasonably be supported by the evidence. *Hagberg v. Colonial & Pacific Frigidways, Inc., supra.* The parties cite numerous cases reaching different conclusions on this question, but each rests peculiarly upon its own factual configuration and none aid resolution of this case sufficiently to merit discussion. The evidence recited in

---

1. AMPI argues, inter alia, that the court's instructions to the jury on this issue were erroneous in that they overemphasized the element of control. We conclude, however, that the emphasis was consistent with the numerous cases which cite "control" as the single most important factor.

the several next succeeding paragraphs, assuming it was all admissible,[2] is sufficient to support the jury's verdict, notwithstanding that it might have decided the issue differently.

AMPI was organized in 1969 as the result of a long series of mergers between various dairies, including Western Dairy, Five Star Dairyland Cooperative (hereafter, Five Star), and Milk Producers, Inc. In January 1970, Viessman, who had operated a milk hauling business out of Worthington, Minnesota, from 1965 until 1969, began to haul for AMPI. He moved his business to Clarkfield, Minnesota, where an AMPI plant was located. He bought a garage where he could service his five trucks, and he bought from AMPI, which had some excess equipment for sale, two additional trucks and two tanks. He borrowed some of the money for this $45,000 transaction from AMPI and some from the Farmers Merchants State Bank, New Ulm, the bank with which AMPI did business. AMPI arranged the loan from the bank. At the time of this accident, Viessman owned seven or eight trucks. His name was carried on the doors of the cabs; AMPI's emblem was carried on the sides of the tanks.

AMPI assumed the contract under which Viessman had previously been hauling for Five Star. Viessman had not negotiated the contract with Five Star. He testified that his practices did not change in any way when he began to haul for AMPI. The contract, which was in effect the day of the accident, states that Viessman is an independent contractor for whose acts Five Star is not liable; that the contract for hauling is one between Viessman and the farmer-producers, Five Star's only obligation under it being to deduct from the farmers' accounts an amount equal to Viessman's charges; that Viessman shall supply trucks and tanks, and shall keep them clean; that Viessman will carry cargo insurance; that Five Star shall have no control over the time, manner, means, or method of Viessman's performance with respect to routes and schedules; that payment is to be made monthly; that in the event of termination of the contract by either party, because of the specialized nature of the tanks, trailers, and trucks, Viessman must secure Five Star's approval of any sale of the equipment and if such approval is not given, Five Star will buy the equipment itself; that Viessman carry liability insurance; that Viessman will not haul for a competing creamery without Five Star's consent nor, upon termination of the contract, pick up milk from Five Star producers nor solicit their business within 3 years; that either party has the right to terminate the contract without notice in the event of breach by the other.

■ The label which the contract attaches to the employment relationship is not solely determinative. We look, rather, primarily to the conduct of the parties operating under the contract. *Barnes v. Northwest Airlines, Inc.,* 233 Minn. 410, 47 N.W.2d 180 (1951); *Gill v. Northwest Airlines, Inc.,* 228 Minn. 164, 36 N.W.2d 785 (1949). It is that conduct to which the law attaches consequences. Viessman's understanding of his contractual relationship with AMPI, reinforced by the evidence of the actual practice of the parties under it, is in our view of greater significance than any formal language of the contract which might otherwise suggest a contrary intent.[3]

Testimony concerning the direction and control in the performance of work by Viessman and his seven or eight drivers by

2. AMPI assigns various evidentiary errors which we discuss *infra.*

3. Although the terms of the contract are, for the most part, in the language of independence, the restrictions upon Viessman's sale of the trucks or performance of work for others to some extent diminishes the expression of independence. Furthermore, the evidence discloses a divergence from particular contractual provisions. For example, the jury could find that AMPI participated in establishing the routes, and on at least one route AMPI subsidized the cost of the hauling. Also, Viessman's drivers delivered AMPI products such as butter, cream, and cleansers which the farmer-producers ordered and for which Viessman received a commission. This arrangement is not described in the contract.

AMPI through AMPI fieldmen, the admissibility of which was contested, is of critical importance in sustaining the jury's verdict. It is not disputed that the fieldmen could ride on Viessman trucks whenever they chose to do so, whereas Viessman never did so. Gilbert Sievers, a former driver from 1965 to 1970, hired originally for hauling to Five Star's plant and thereafter to AMPI's, testified that a fieldman would ride with him about once a week and sometimes 3 or 4 days consecutively. Sievers testified that a fieldman assisted him in first learning to drive a liquid load and that he received instructions from the fieldman, not from Viessman, relative to changes in routing necessary to avoid muddy or weight-posted roads, to pick up new producers, or to by-pass discontinued producers. According to Sievers, AMPI occasionally conducted general meetings with all drivers at which the drivers' duties were discussed.

Clarence Gorter, a fieldman since 1960, originally for Western Dairy and eventually for AMPI, testified that he worked as a fieldman with Viessman's drivers occasionally from 1967 to 1969, although not in the more recent years of 1970 and 1971. With respect to the drivers with whom he did work, Gorter testified, in corroboration of Sievers, that he would ride with them occasionally to be sure that they pulled into the farms safely, picked up the milk sample correctly, kept the samples cool, and kept themselves and the equipment clean. Gorter testified that he would not ordinarily comment on a driver's driving, but if a driver drove too fast or failed to stop at a stop sign, he would caution him. Gorter

had the responsibility to see that the AMPI emblems were on the trucks. Gorter testified that he had authority to fire a driver for failure to perform his job properly, but acknowledged that he had not in fact ever fired anyone.[4]

■ AMPI objected to the Sievers-Gorter testimony on the grounds that it related to events and practices several years prior to the date of the accident and was therefore irrelevant. Such an objection is addressed to the discretion of the trial court. *Renne v. Gustafson*, 292 Minn. 218, 194 N.W.2d 267 (1972). We find no abuse of that discretion in the admission of this testimony which, for the most part, was restricted in scope to the years 1968 through 1971. The year of the accident was 1971. Because the existence of an employment relationship like the one here in issue cannot be defined by practices at one fixed point in time, evidence of conduct during these immediately prior years is not impermissibly remote. Its remoteness goes only to the weight of the evidence.

The jury also had before it David Sharpee's testimony of more recent date. Sharpee, who as AMPI's director of field services from 1970 to 1972 supervised the fieldmen, was called by plaintiffs for cross-examination under the rules. He described the duties of the fieldmen to include riding with each driver of the various contract haulers[5] at least once, preferably twice a year, when they would observe the drivers' performance with respect to cleanliness[6] and the safe operation of their trucks. Ac-

---

4. According to Gilbert Sievers, his own employment as a driver was terminated in 1970 by AMPI personnel when he attempted to organize the other drivers into a labor union. Although initially Sievers identified the man who fired him as Jim Rockford, when told that Rockford was not employed by AMPI until later, Sievers stated that he had been informed that the man was Rockford but that whatever his name, he was an AMPI employee. Viessman, on the other hand, testified that Sievers had told him he was quitting and that he, Viessman, knew nothing of a discharge.

5. Viessman was described by himself and others as a "contract hauler."

6. The milk industry is a highly regulated one. According to Sharpee, the state and not AMPI sponsored seminars for the drivers relative to their duties. The fieldmen were to inform the drivers of the regulations promulgated by the state department of agriculture and they would discuss the importance of sanitary conditions. If a driver consistently picked up bad milk, AMPI could see that he was relieved by advising the department of agriculture that AMPI could not work with the man, although, unlike other companies, AMPI never had done so.

cording to Sharpee, the fieldmen would not fire a driver, but would report any complaints relative to a driver's excessive speed to AMPI's director of transportation who in turn would take the matter up with the contract hauler. He, in turn, would be the one who would actually effect the discharge of the driver.

Viessman's knowledge of fieldmen practices and his perceptions of his relationship with AMPI are important and contested. He testified, on the one hand, that he hired and fired the drivers, that he paid them, taking customary payroll deductions and issuing them W–2 employer tax forms, and that he purchased workmen's compensation insurance covering them. He testified, on the other hand, that, although it had never done so, AMPI could compel him to fire a driver. He considered himself bound to carry out any "suggestions" made by AMPI, including those relating to the drivers' operation of the trucks. On one occasion, when additional routes were assigned to Viessman by AMPI, AMPI told him to hire the drivers who had been serving those routes, which he did. Similarly, if AMPI were to ask that a driver work a different route, Viessman stated that he would comply.

█ The admissibility of Viessman's declared understanding that AMPI could compel him to discharge one of his drivers was, of course, the subject of vigorous objection. Although it presents a close question, we hold that in the context of all the other admissible evidence the trial court did not abuse its discretion in ruling it admissible. The testimony represents the perception of one of two parties to the contract as to their actual relationship and is relevant as such. The fact that AMPI never made such a request goes to the weight of the evidence but not to its admissibility. Although Viessman may have served a self-in-

terest in making that declaration in the posture of this case, the details of the practice under the contract would not compel a ruling that it was spuriously self-serving.[7]

The testimony of Fehl, defendant driver, added little to the evidence, based upon his employment as a new and part-time driver. He was hired by Viessman in August or September 1971 to work on a part-time basis relieving the full-time drivers on their days off; he had worked nine weekends driving one of Viessman's trucks prior to the date of accident. He testified that no fieldman ever rode with him; instead, one of Viessman's sons accompanied him the first few times he worked and showed him what to do. Fehl would be told which truck to drive and when by someone from "Viessman's operation."

█ The adverse testimony of Fehl was that "always I thought Cliff [Viessman] was my direct boss, but I thought we were always under AMPI, they had the say on how the milk was to be hauled and stuff, I always thought." This testimony was patently inadmissible except only, as the trial court observed, that the statement was genuinely intended to be, and was, responsive to AMPI's own question, by which AMPI should therefore be bound. We cannot believe, in any event, that this opinion of this so recently hired driver would have significant impact upon the jury, nor that the jury would understand it as a legal conclusion rather than as the factual statement elicited.

There is a final element in the economic relationship of Viessman and AMPI which colors the asserted independence of Viessman. Viessman hauled only milk from farmer-producers who sold to AMPI. Viessman did not solicit the farmer-producers' business, so any expansion in the business depended upon the success of AMPI's

---

7. AMPI argues that the court erred in refusing to allow it to call Viessman as an adverse witness under Rule 43.02, Rules of Civil Procedure. AMPI did not cross-claim against Viessman. The trial court denied AMPI's motion, ruling that there was neither adversity on the pleadings nor adversity in fact. The trial court's decisions with respect to when leading questions will be permitted will not be reversed in the absence of a clear abuse of discretion. See, *Klingbeil v. Truesdell*, 256 Minn. 360, 98 N.W.2d 134 (1959). Cf. *Kugling v. Williamson*, 231 Minn. 135, 42 N.W.2d 534 (1950). We find no such abuse.

own efforts in contracting with additional farmers. Viessman's gross receipts from AMPI as shown on Viessman's tax returns for 1971 totaled $300,647.92. These receipts derived from a fixed payment per hundred-weight of milk hauled and a commission paid him for dairy products ordered from AMPI by the farmers and delivered by the drivers. Viessman and his wife filed a joint return for a sole proprietorship; AMPI made no income tax withholding or payroll deductions from Viessman's checks, except for hospitalization insurance which Viessman purchased for his family and for one driver as part of an AMPI insurance program.[8] From the gross receipts, Viessman took deductions for depreciation on his trucks which amounted to $46,371.80, and took deductions for repairs, salaries and wages, and insurance; as well as exemptions for nine children. Viessman's net taxable income was $13,476.27, and only $9,200 was from his trucking business (the remainder being derived from the sale of his fertilizer business). Again, elements of the evidence may support a conclusion either for or against an employer-employee relationship, but we think of particular significance is the fact that the net of Viessman's gross income from the large gross receipts is strikingly similar to the salary that might be paid to an employed foreman.

We hold that the evidence raised a jury question as to the relationship of Viessman and Fehl to AMPI. There was evidence, of course, both in the formal words of the written contract and some of the testimony, consistent with a finding that Viessman was an independent contractor. There was, however, substantial evidence upon which the jury could find that AMPI, through its own fieldmen, exercised control over Viessman and his drivers—not only as to what they were to do, but over how they were to do it. The jury could find under the circumstances recited at length[9] that AMPI

exercised more than the influence to be expected when one powerful party to a contract makes "suggestions" to the other less powerful party so exclusively dependent upon it for a livelihood. The trial court clearly did not err in refusing to direct a verdict in favor of AMPI.

2. AMPI argues that, notwithstanding the jury's finding that Viessman was the employee of AMPI, the trial court could not find AMPI liable for the negligence of Viessman's employee, driver Fehl. AMPI requested either that the jury be asked to make such a determination as part of the special interrogatories or that the court decide as a matter of law that Fehl was an employee only of Viessman. The trial court denied AMPI's request for submission of the interrogatory to the jury, and itself determined from the undisputed fact that Fehl was an agent of Viessman that "insofar as the issue of vicarious liability is concerned * * * Mr. Viessman and Mr. Fehl are one and the same person."

We hold that the trial court reached the right result. Although Viessman was the immediate employer of Fehl, that employment was in the real interest of AMPI. It could not be otherwise, for Viessman worked exclusively for AMPI in the controlled hauling operations and AMPI had no other hands to drive this truck than those of Viessman hired to do AMPI's work. Having assumed the right and responsibility through its fieldmen authoritatively to instruct and supervise these drivers, AMPI may not be insulated by some technical obstacle from liability for Fehl's negligence. See *Larson v. LeMere,* 220 Minn. 25, 18 N.W.2d 696 (1945).

3. AMPI, joined in part by Viessman and Fehl, contends that it is entitled to a new trial because of prejudicial error of the trial court in denying discovery under Rule

8. With Viessman's approval, AMPI also deducted amounts which were paid to AMPI and to the Farmers Merchants State Bank in reimbursement of Viessman's loan for equipment.

9. It is not ordinarily necessary to state at length the evidence supporting a verdict. It

should be apparent that this decision turns on the specific facts of this case, which may well be distinguishable in future cases where a jury decides otherwise.

26.02(3), Rules of Civil Procedure,[10] of three recorded statements: One given by non-party witness Gilbert Sievers to plaintiffs' attorney; one given by third-party defendant Arthur Drenth to plaintiffs' attorney on January 5, 1972; and a second one given by Drenth to his insurance adjuster several months after the accident.

■ The trial court did, as Ossenfort acknowledges, err in refusing discovery of the statement of Sievers, for under Rule 26.02(3), statements of non-party witnesses are discoverable as of right, without a showing of need or inability to obtain their substantial equivalent. However, as the text of the statement appended to the Ossenfort brief makes evident, defendants were not prejudiced by not obtaining it, for Sievers' testimony at trial was not inconsistent with it. Although defendants assert that the statement contains "*vitally important impeachment evidence, which, had it been disclosed at time of trial,* would have been helpful to AMPI," we find no significant differences and hold that the error was not prejudicial.

■ Making a statement available for the first time on appeal is not, of course, a substitute for pretrial discovery. The occasion to append such a statement to an appeal brief should not again arise since our decision in this case dispels the ambiguity which the trial court saw in Rule 26.02(3).

■ The statements of Drenth, in contrast to those of Sievers, are the statements of a party. AMPI, Viessman, and Fehl argue that they are discoverable under Rule 26.02 upon a showing of substantial

need and inability to obtain their substantial equivalent and that this showing was made. Plaintiffs agree that this rule determines whether these statements are discoverable but contend that the requisite showing was not made. Drenth argues that any statement by a party is not discoverable by an opposing party. The trial court refused discovery on the grounds that statements by a party to his insurer or his attorney are privileged, and that if Rule 26.02 intended to abrogate that privilege, it should so state unequivocally.

Rule 26.02(3) does not abrogate any attorney-client privilege. That provision is explicitly made subject to the limitations of Rule 26.02(1), which provides that "[p]arties may obtain discovery regarding any matter, *not privileged,* which is relevant * * * ." (Italics supplied.) In any event, Drenth's statement to *plaintiffs'* attorney does not fall within the attorney-client privilege.

Assuming both statements were not privileged, the trial court nonetheless did not abuse its discretion in denying discovery, because the requisite showing of need and hardship was not made. AMPI's argument that the rule was satisfied consists of the assertion that "[c]ertainly the prosecution of a 3.5 million dollar lawsuit, where the precise version of the accident by a party such as Arthur Drenth was vitally important (as was any impeachment evidence), should satisfy the 'substantial need' test." Federal courts applying identical Rule 26(b) have held that "mere surmise" that a statement might include impeachment material does not constitute substantial need. See,

10. Rule 26.02(3), Rules of Civil Procedure, provides: "Subject to the provisions of subdivision 26.02(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision 26.02(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has

been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

"A party may obtain without the required showing a statement concerning the action or its subject matter previously made by that party. Upon request, a person not a party, or a party, may obtain without the required showing a statement concerning the action or its subject matter previously made by that person who is not a party * * * ."

e. g., *J. H. Rutter Rex Mfg. Co. v. N. L. R. B.*, 473 F.2d 223 (5 Cir. 1973), certiorari denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55.

There is no reason to believe, moreover, that the "substantial equivalent" of the statements could not be obtained. AMPI had equal access to Drenth at the time the statements were taken, and Drenth remained accessible until trial. AMPI did, finally, serve interrogatories on and depose Drenth. AMPI made no claims that Drenth was hostile or his memory faulty. The statements sought were not made immediately after the accident, giving them a spontaneity whose substantial equivalent could not be duplicated with the lapse of time. Contrary to AMPI's argument, we will not presume the existence of useful information from Drenth's refusal to make available statements not shown to be otherwise discoverable.

4. AMPI, Viessman, and Fehl contend that the trial court's refusal to grant their motion, made after the commencement of trial, for an adverse medical examination of plaintiff was an abuse of discretion and requires a new trial.[11] Plaintiffs called one physician to testify. AMPI, Viessman, and Fehl did not and do not contest the physician's diagnosis of Ossenfort's injuries, but claimed surprise at the enormity of the expenses which he estimated would be necessary to provide Ossenfort with optimum medical care in the future. The parties had stipulated to medical expenses of approximately $80,000 for the 3½ years between the time of the accident and trial. Plaintiffs' witnesses testified that the current cost of optimum care for Ossenfort for the rest of his life totals $48,450 per year. AMPI argues that plaintiffs wrongfully failed to disclose these cost estimates as requested by AMPI in the course

of pretrial discovery. On April 29, AMPI served supplementary interrogatories on plaintiffs, one of which requested the names and addresses of medical and nonmedical experts which plaintiffs anticipated calling and a summary of their expected testimony. Plaintiffs' answer, served May 19, listed, among other witnesses, Dr. Harold Noran, who would testify "regarding [plaintiff's] condition and treatment and future medical treatment required." It also disclosed the name of Dr. Edward Foster, an economist, and stated that he would testify about future costs but that his report had not yet been prepared. Two days later, plaintiffs gave a copy of Dr. Foster's report to defendants. That report stated that calculations of future medical costs were based upon estimates of Dr. Noran. Those costs were itemized at current annual amounts of $12,000 in physicians' fees, $20,000 in hospital charges, $1,850 in drugs and medical supplies, and $14,600 in 24-hour nursing care for a total of $48,450. AMPI could not have been prejudiced by plaintiffs' failure to include these amounts in their May 19 answers to interrogatories, since plaintiffs disclosed Dr. Foster's report 2 days later and before the time for answering the supplementary interrogatories had expired.

The trial commenced on May 27, about 1 week after defendants' receipt of the report. Dr. Noran testified during the third day of trial. He estimated costs as disclosed in Dr. Foster's report. Counsel for AMPI cross-examined Dr. Noran briefly but made no objection to his testimony. At no time did AMPI, Viessman, or Fehl request a continuance.

During the weekend following Dr. Noran's testimony, however, counsel for AMPI contacted two physicians who agreed to testify concerning the cost of care on the basis

---

11. Rule 35.01, Rules of Civil Procedure, provides: "In an action in which the mental or physical condition or the blood relationship of a party, or of an agent of a party, or of a person under control of a party, is in controversy, the court in which the action is pending may order the party to submit to, or produce such agent or person for, a mental or physical or blood examination by a physician. The order may be made only on motion for good cause shown and upon notice to the party or person to be examined and to all other parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is made."

of a review of the medical records and a short examination of Ossenfort. On Monday, trial having been recessed until Tuesday, AMPI contacted plaintiffs' attorney and the court to request an hour-long medical examination. Both denied the request. The court indicated that it would permit the physicians to go to the nursing home and view Ossenfort but that they were not to touch him, and that it would allow them to testify on the basis of the extensive medical records. Counsel for AMPI stated that the doctors would not testify without first examining Ossenfort. Counsel argued that if he called the physicians to testify, they would be subjected on cross-examination to the devastating question of whether they had personally examined the plaintiff.

The trial court denied the motion for several reasons. It was of the opinion that a 1-hour physical examination would serve only to subject Ossenfort to discomfort and embarrassment, inasmuch as a view of the plaintiff and an examination of the records would be adequate where the issue concerned the type and cost of care and not the extent of his injuries. As the court further stated, defendants must have anticipated such testimony and could not have been surprised by it. Since the physicians would be precluded by court order from conducting a personal examination, the court indicated that no cross-examination by plaintiffs on the subject of a personal examination would be permitted.[12]

Whether or not to allow a medical examination by adverse parties is a decision committed to the trial court's discretion. *Hill v. Hietala*, 268 Minn. 296, 128 N.W.2d 745 (1964). Had the trial court allowed a medical examination in this case, we would find no abuse of its discretion. We nevertheless hold that its refusal to allow an examina-

tion was not an abuse of discretion, given the lack of justifiable surprise on AMPI's part, the fact that AMPI was not altogether precluded from offering testimony on costs, the fact that the issue was not the nature of the injuries but the appropriate care and its cost, and the fact that AMPI could argue the weight of this testimony to the jury by emphasizing the substantially lower actual costs of care during the 3½ years subsequent to the accident.[13]

5. Dr. Edward M. Foster, Professor of Economics at the University of Minnesota, gave expert testimony estimating Ossenfort's future damages on the basis of projected inflationary trends. AMPI, joined by Viessman and Fehl, contends that it was error to admit this testimony on the grounds that it was impermissibly speculative, particularly when those projections extended for a considerable future time, in this case almost 34 years. We have held that a jury may consider the current inflationary trend of the economy in arriving at an appropriate award of damages, but the precise question now presented is one of first impression.

Three factors entered into Dr. Foster's calculation of the present value of Ossenfort's future damages: (1) Evidence of Ossenfort's current annual medical costs and loss of earnings; (2) testimony that with proper care, Ossenfort would live a normal expectancy of 33.9 more years; and (3) the assumption that the rate of return on investment of Ossenfort's award would exceed the rate of inflation by 1 percent. This latter assumption derives from Dr. Foster's comparison of inflation rates and interest rates on United States Treasury bonds since 1947. The effect of this assumption is to discount to present value by

12. AMPI apparently did not seek to find a physician willing to testify under the court's conditions. It called no medical witness. Viessman and Fehl called as a witness the administrator of a local nursing home who testified that the cost there of care for a quadriplegic approximated $7,000 to $8,000 per year.

13. During each of the 3½ years after the accident, plaintiff averaged medical expenses of

about $23,000 per year. These amounts included expenses which presumably will not be repeated: 5 months in intensive care; a tracheotomy; two shunt operations in which a hole is drilled in the skull and a tube inserted through the bone, into the jugular vein, and into the heart. Of course, at the time of trial Ossenfort was not receiving optimum care.

a factor of 1 percent. Dr. Foster did not predict high or low or continuing inflation. He hypothesized, however, that the relationship between interest and inflation will continue to be relatively constant, and that if inflation is low, the rate of return on investments will be low while if inflation is high, the rate of return will be high. By this method, the witness calculated the present value of future medical costs as $1,461,700 and of future earnings loss as $292,966.

Courts which have passed on the question of the admissibility of expert testimony on the subject of inflation are divided in rationale and result. The majority of Federal courts which have considered the question in applying Federal claims statutes have, in the words of *Johnson v. Serra*, 521 F.2d 1289, 1295 (8 Cir. 1975), "rejected testimony, jury instructions or trial court consideration of future inflationary trends in damage assessment." [14] At least one state, Alaska, in contrast, has held that because there is "no reason to expect that [inflation] will not be with us in the future * * * justice will best be served by permitting the trier of fact to compute loss of future earnings without reduction to present value." *Beaulieu v. Elliot*, 434 P.2d 665, 671 (Alaska, 1967). We have ourselves recently reaffirmed that damages must be discounted to present value, but we have not specified by what factor they are to be discounted. *Steinhaus v. Adamson*, 304 Minn. 14, 228 N.W.2d 865 (1975).

Various courts have had to balance two opposing policies in reaching decision: On the one hand, to prevent overcompensation of a plaintiff to the unjustified hardship of a defendant; and on the other hand, to avoid undercompensation of a plaintiff for injuries for which the law holds a defendant liable. We have ourselves held that a jury may consider the current inflationary trend of the economy in arriving at an award of damages. *Moteberg v. Johnson*, 297 Minn. 28, 210 N.W.2d 27 (1973). In allowing courts to instruct and counsel to argue that the jury may consider inflation, we have taken the position that inflation is a fact of life which cannot fairly and realistically be ignored. The complexities of economics, no less than those of medicine, merit the assistance of expert testimony, so important to an adequate assessment of plaintiff's damages. We hold that the testimony of Dr. Foster in this case was admissible.

We do not intimate, of course, that all expert economic testimony concerning inflation is admissible. Whether testimony is too speculative to be permissible is a difficult question addressed to the discretion of the trial court and resolved on a case-by-case basis depending upon the nature of the testimony. As with all properly admitted testimony, the weight to be given the expert testimony of an economist is subject to argument. Contrary evidence may be introduced and the expert is subject to cross-examination. Counsel for Viessman and Fehl effectively cross-examined Dr. Foster, eliciting testimony that investments at interest of 9 and 10 percent are currently available. The jury, in returning an award of $1,000,000 obviously did not rely wholly upon Dr. Foster's testimony since his estimates of most but not all elements of damage approximated $1,750,000.

6. The award of damages for plaintiff Lloyd Ossenfort's devastating inju-

---

14. The case of *Johnson v. Serra*, 521 F.2d 1289 (8 Cir. 1975), is of particular interest because it is a recent decision of the United States Court of Appeals, Eighth Circuit, governed by the substantive law of Minnesota and because it too involved the expert testimony of Dr. Edward M. Foster. The court of appeals disallowed Dr. Foster's testimony. In declining to adopt its conclusion, we note that Dr. Foster in *Johnson* based his calculations on his opinion that the decedent's income as a member of the Teamster's Union would have continued to increase at an average annual rate 1½ percent greater than the return on conservative investments. Teamster wage increases depend not only upon the largely impersonal market forces responsible for inflation but upon the vagaries of contract negotiation. In the instant case Dr. Foster did not state an opinion as to whether or not Ossenfort's farm income would have increased, much less did he project the exact income which Ossenfort would have earned in the year 2008. Cf. *Bach v. Penn Central Transportation Co.*, 502 F.2d 1117 (6 Cir. 1974), upon which the court of appeals in *Johnson* heavily relied.

ries ($1,000,000) and for plaintiff Eleanor Ossenfort's loss of consortium ($500,000) were predictably contested as excessive before the trial court on post-trial motion and before this court on appeal.

The award as to Lloyd Ossenfort was clearly not excessive, given the settled factors applicable to the assessment of personal injuries: Past and future pain and suffering, permanent disability, life expectancy, loss of earning power, the effect on plaintiff's enjoyment of the amenities of life, degree of disfigurement, and the inflationary trend of the economy. See, e. g., *Moteberg v. Johnson*, 297 Minn. 28, 210 N.W.2d 27 (1973). Dr. Noran testified that plaintiff would never walk again nor hold a job. He has no control over basic bodily functions. He is psychotic. His IQ has deteriorated to 86, which is nonetheless high enough for him to have some understanding of his condition and its effect on his wife and two daughters. At the time of the accident, Lloyd worked as a farmer. He was 34 years old, his wife was 31, and his daughters were 2 and 9.

The evidence supports a finding of damages in the following amounts at present value: Past medical expenses, $80,000; past lost earnings, including income in kind for food and housing, $25,220; future medical expenses, $1,461,700; future loss of income, $292,966; home and equipment specially designed for a quadriplegic, $76,202. These elements of damage, which include no amount for pain and suffering, total $1,936,088. The jury award, as noted, was $1,000,000

The propriety of the award to Eleanor Ossenfort is less clear, for damages for loss of consortium are not, by their nature, readily quantifiable. In *Thill v. Modern Erecting Co*, 284 Minn. 508, 510, 170 N.W.2d 865, 867 (1969), in which we recognized a wife's cause of action for loss of consortium, we defined consortium:

" 'Consortium,' as a general description, represents reciprocal rights inherent in the marital relationship of husband and wife, including such undefined elements as comfort, companionship, and commit-

ment to the needs of each other.[2] Its

[2] Mr. Justice Keating has described 'consortium' in *Millington v. Southeastern Elev. Co.*, 22 N.Y.2d 498, 503, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897, 899, in these words: ' * * * It is the interest which may have turned a happily married woman into a life-long nurse and deprived her of the opportunity of rearing children. Disparagingly described as "sentimental" or "parasitic" damages, the mental and emotional anguish caused by seeing a healthy, loving companionable mate turned into a shell of a person is real enough. * * * The loss of companionship, emotional support, love, felicity and sexual relations are real injuries. * * * There may not be a deterioration in the marital relationship, but it will certainly alter it in a tragic way." Such descriptions are too expansive. It may at least be doubted that 'love' itself, as expressed in the traditional marriage vows, is altered by sickness or injury."

'predominant element,' however, as more specifically described by plaintiff's counsel, is 'the loss of sexual relationship,' presumably including frustration of man's primal drive of reproduction. The predominance of this element tends both to exclude claims asserted by children for injury to a parent and to avoid excessive appeal to sentimentality. The marital relationship is a wholeness, so, except only as we have emphasized a specific facet of it, attempts otherwise to single out its elements for the assessment of damages would be inappropriate."

In its post-trial memorandum, the trial court described the evidence before the jury of the special relationship between Eleanor and Lloyd Ossenfort:

"In the opinion of the Court, the jury, having had the benefit of the evidence introduced and the personal testimony of Mrs. Ossenfort, together with the manner in which she conducted herself throughout the course of the trial, including the personal contact the jury was able to view between Mrs. Ossenfort and her husband through the film which was shown demonstrating the home care administered to Mr. Ossenfort in what was claimed to be a typical day, and during the time that Mr. Ossenfort was personally in Court, could find that there had existed prior to the accident love and

devotion between Mr. and Mrs. Ossenfort that far exceeded that which normally is present between husband and wife. The jury could find that the home life which had existed prior to the accident was one of exceptional harmony and happiness. The jury could find that the relationship between Mr. and Mrs. Ossenfort was one that would have been virtually impossible to sever and that neither one would have had any reason to look for affection or satisfaction from a third party. The jury could find that the companionship that would have been Mrs. Ossenfort's for years to come would have provided her with a life more meaningful than the great majority of people could anticipated or would experience.

"The jury could find that as a result of the injuries sustained by Mr. Ossenfort, Mrs. Ossenfort lost entirely all the companionship that had been experienced and also which she would have enjoyed in the future. The companionship involved includes that which Mr. Ossenfort provided as a person possessed of the mental faculties and capacity to give intellectual and emotional support and stimulation to the marital relationship and also the physical health to fulfill sexual needs to Mrs. Ossenfort."

The evidence of Eleanor's damages was not confined to proof of loss of consortium, however. There was evidence upon which the jury could award special damages for nursing services. We acknowledged in *Thill v. Modern Erecting Co.*, 284 Minn. 508, 170 N.W.2d 865 (1969), and *Thill v. Modern Erecting Co.*, 292 Minn. 80, 193 N.W.2d 298 (1971), that such damages may constitute an element of the award to either husband or wife but not to both. Damages for nursing services are particularly appropriate in this case because Eleanor is a licensed practical nurse. She lived at the hospital the first 9 weeks after the accident, caring for Lloyd. As he improved, she encouraged the doctors to allow him to make home visits. Eventually she brought him home to stay. The jury was shown a movie of a typical day in the lives of plaintiffs. Lloyd required tremendous care. He had to be bathed daily and medicated to avoid bed sores; his urecatheter had to be emptied and his bladder irrigated; his food had to be easy to swallow so that he would not choke. He could not move himself and Eleanor would have to transfer him from the bed to his wheelchair and back. During the months he was home, Eleanor had help from county nurses 3 mornings a week for 4 hours each morning. When the plaintiffs' funds were exhausted, Eleanor was forced to go to work to support her family and had to place Lloyd in a nursing home. Lloyd regressed, becoming more psychotic, and less able to speak and care for himself. Eleanor testified that she would like him to return to the family home.

Assuming that the major part of Eleanor's award was for loss of consortium, however, we admittedly did not, at the time of deciding *Thill v. Modern Erecting Co.*, supra, foresee that a jury would assess damages for loss of consortium in amounts as substantial as in this case. We undertook to circumscribe the right of recovery to avoid double recovery. The trial court carefully adhered to this mandate, cautioning the jury against including in Eleanor's award any damages for which Lloyd was compensated.[15] The record in this case evinces a marital relationship so extraordinarily close that the nature of Lloyd's injuries manifestly resulted in extraordinary loss to Eleanor. We have considered in this case, as we will in future cases, the total of the award to husband and wife, from which we conclude that the award was not excessive.

▉ 7. Defendants Viessman and Fehl assign reversible errors in the admission of irrelevant testimony by Drenth relative to his wife's brain surgery, and in the court's denial of a new trial on the grounds of

---

15. The additional conditions imposed by *Thill v. Modern Erecting Co.*, 284 Minn. 508, 513, 170 N.W.2d 865, 869 (1969), upon a wife's right of action for loss of consortium were also met here: Ossenfort himself recovered from defendants; Eleanor's cause of action was joined with his action; and the awards were joined in judgment.

improper closing remarks by counsel for Drenth. We need not reach the merits of these arguments because we find on the record no evidence of Drenth's negligence. Any error in admitting the testimony or permitting the argument was without prejudice.

8. AMPI contends, finally, that a new trial should have been granted it because of prejudicial misconduct of the bailiff, who inadvertently exposed to the jurors' view, as they began deliberations, this headline of a newspaper published that day, June 11, 1975: "AMPI billed $5.6 million for back taxes, penalties."

The trial court, which was not at that time aware of the incident, had denied AMPI's request that the jury be sequestered, but had given the usual instruction cautioning the jurors not to read any newspapers or listen to broadcast news. On June 24, 1975, after the jury returned its verdict, the court conducted a Schwartz hearing (*Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 [1960]; *Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 191 N.W.2d 418 [1971]) to determine the extent of the jurors' knowledge of this news and the effect of such knowledge upon their verdict.

Shortly after retiring to begin deliberations, the jury, accompanied by the bailiff, had gone to dinner. On their return the bailiff picked up his daily newspaper at his home in order to have something to read while the jury deliberated. Upon entering the jury room, the bailiff tossed the paper face up on the table as he went to turn on the lights. All the jurors saw the offending headline, but none read the accompanying news report. Except for the comment of one juror at that moment that AMPI was in the headline, none of the jurors observed it in the jury room. None saw or heard any other news coverage on the subject nor discussed the subject with friends or relatives outside the jury room. The trial court asked each juror whether the headline had any effect on its resolution of the case, and each answered that it had not.

We hold that the trial court did not abuse its discretion in denying AMPI's post-trial motion for a new trial. We do not, however, lightly dismiss the careless act of the bailiff, for even the headline conceivably could indirectly convey to a jury the implications of a defendant's "deep pocket" or questionable character, either of which would be sternly rejected if undertaken directly by counsel at trial. We do not, moreover, ascribe dispositive significance to a juror's bare assertion that such a headline in no way influenced him. See, *State v. Lilja*, 155 Minn. 251, 193 N.W. 178 (1923); *Aldrich v. Wetmore*, 52 Minn. 164, 53 N.W. 1072 (1893).

The trial court, however, is in the best position to assess prejudice, and there are unique circumstances that undergird the court's assessment in this case. The trial took place in Nobles County, an agricultural area, in which AMPI was no stranger before this trial occurred. Even before the June 11, 1975, publication of the newspaper article headlining AMPI's tax troubles with the Internal Revenue Service, these and the actual or alleged wrongful political activities associated with it had been the subject of repeated state and national publicity for an extended period of time. And to the extent the headline would indicate AMPI's probable affluence, the nature of the admissible evidence at trial concerning its operations doubtless would have indicated that AMPI was a corporation of considerable economic substance. None of these "facts," of course, were at issue in the case. The jurors had been expressly cautioned not "to do anything that would in any way influence you other than by the evidence that has been brought to you in this Courtroom." Given the totality of the surrounding circumstances, the trial court, in the exercise of its discretion and informed judgment, reasonably could find that no prejudice resulted from the inadvertent and momentary exposure of the newspaper headline to the jury. See, *City of Bloomington v. Vinge*, 284 Minn. 202, 208, 169 N.W.2d 752, 756 (1969).

Affirmed.