STATE of Minnesota, Respondent,

v.

Jamie Glenn RICHARDSON, Appellant.

No. C9–02–815.

Supreme Court of Minnesota.

Oct. 23, 2003.

Sara Lynne Martin, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Bruce L. Anderson, Lake County Attorney, Two Harbors, MN, Mike Hatch, Minnesota Attorney General, Kelly Susan Kemp, Assistant Attorney General, St. Paul, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Appellant Jamie Glenn Richardson was convicted of one count of first-degree (premeditated) murder and one count of first-degree (felony) murder for the shooting death of Robert Van Der Molen and was sentenced to concurrent life terms. Richardson was also convicted of two counts of first-degree assault against police officers who responded to the shooting and two counts of kidnapping his wife and her daughter during a standoff with police and was sentenced to 672 consecutive months for these offenses.[1]

In this direct appeal, Richardson argues that he was denied his right to present a defense at trial and his right to testify on his own behalf. He also claims that the trial court erred by admitting hearsay into evidence, by refusing to instruct the jury on lesser-included offenses to the first-degree assault charges, by imposing two concurrent life sentences for the murder convictions of one victim, and by imposing sentences for the other offenses that un-

fairly exaggerated the seriousness of those offenses. We vacate one first-degree murder conviction, affirm the other convictions, and reduce the duration of Richardson's prison terms on the two first-degree assault convictions to 120 months on each, the mandatory minimum terms.

I.

On Monday, January 8, 2001, Heather Nichols, Richardson's estranged wife, left Richardson and sought help from the local domestic violence shelter, which arranged for transitional housing in a Two Harbors apartment. Nichols obtained a restraining order against Richardson because he had threatened her life and called Robert Van Der Molen, her former husband, who said that he would come to get her and her three children. Van Der Molen, who lived in Iowa, arrived in Two Harbors between 3:30 and 4:00 p.m. on Wednesday, January 10. Nichols left a message at the domestic violence shelter stating that she would be leaving the apartment the next day. Sometime between 8:30 and 11:00 p.m., Richardson purchased two cases of 30–30 shells from a Two Harbors gas station.

In the early morning hours of January 11, Nichols and Van Der Molen awoke to banging and pounding noises coming from either the exterior or downstairs interior door to Nichols' apartment.[2] When the banging did not stop, Nichols herded her two sons, ages five and seven, into a closet. She then heard noises she later realized were shots and joined the boys in the closet. From the closet, Nichols heard Richardson say "daddy's home" as he climbed the stairs to Nichols' apartment. The way he said "daddy's home" reminded

---

1. Richardson also pleaded guilty to possession of a firearm by a felon and received a concurrent sentence of 60 months.

2. Fragments of the downstairs interior door's deadbolt and door knob were admitted into evidence.

her of the movie, *The Shining*. She heard another shot and a body hitting the floor. Then Nichols heard Richardson say, "Bob's dead, you'll never call him again, come out. Kids, where are you?" Richardson pushed open the closet door, banging Nichols on the nose. At that point, Nichols heard a gurgling noise from Van Der Molen, who was lying on the apartment floor. She and the boys watched as Richardson walked over to Van Der Molen, put the gun against his head, and "blew his head apart."

Meanwhile, a tenant and his girlfriend in the downstairs apartment awoke to a man shouting, banging at the door, climbing the steps to Nichols' apartment, cackling like "an insane person," and yelling "here's Johnny." They fled the apartment after hearing gunshots. Before he left the building, the tenant heard Nichols' screams of "don't kill me" and "I have to be here for the kids." Once outside, the tenant's girlfriend called the police. Two Harbors police officers responded to the call.

When the officers began to open the exterior door to the apartment, they heard Richardson say, "you f——kers, you f——kers, don't come up here, officers, you best not come up here" and heard a gunshot they thought was fired toward them.[3] The officers fled the entry area, called for back-ups, and started a shouting dialogue with Richardson. As a back-up officer arrived, Nichols' two sons came out of the apartment building.

Both boys, "very excited" and talking "very fast," told law enforcement personnel that their "dad was dead upstairs and that he had been shot twice" by Richardson. An emergency medical technician (EMT) also spoke with the boys. She

tried to calm them down by stating "maybe he'll be okay," but the boys repeated that Richardson shot their dad twice and that there were "brains all over."

Soon after the boys came out of the apartment, another police officer arrived and positioned himself behind a truck. From his position, he observed Richardson looking directly at him and yelling, "you there behind the truck, get back or I'm going to start shooting." The officer heard a shot and estimated that the bullet passed within five feet of his head.

Nichols remained inside the apartment with Richardson and her 2–year–old daughter for approximately three hours after the boys left. During this time, Richardson punched her, held the rifle to her, and told her he planned to kill her. When Richardson asked Nichols to go downstairs to get his glasses, which were at the bottom of the stairs by the door, Nichols ran outside. She appeared "scared, frightened, and crying," according to law enforcement personnel.

At about this same time, around 5 a.m., an Emergency Response Team (ERT) hostage negotiator, and other ERT members, including a marksman, arrived. At about 6 a.m., Richardson yelled "I'm not coming out, I'm holding the child" which the negotiator assumed meant that Richardson was using Nichols' daughter as a shield. The marksman, who was in a storage shed with a view of the apartment, was given authorization to use deadly force but did not shoot because he believed Richardson was holding Nichols' daughter. When the marksman saw Richardson without the child, he fired a shot that wounded Richardson, who then surrendered.

**3.** Recovered shell casings and part of the stairwell wall, which had a bullet hole in it, were also introduced into evidence.

Richardson was charged by grand jury indictment with first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2002); first-degree felony murder, Minn.Stat. § 609.185(a)(3) (2002); two counts of attempted second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2002); two counts of first-degree assault, Minn.Stat. § 609.221, subd. 2 (2002); two counts of kidnapping, Minn.Stat. § 609.25, subds. 1 and 2(2) (2002); and felon in possession of a firearm, Minn.Stat. § 624.713, subd. 1(b) (2002).

Before trial, the state brought a motion in limine, seeking to exclude evidence of the hostile and violent relationship of Van Der Molen and Nichols toward one another which Richardson argued was admissible under Minnesota Rules of Evidence 404(a)(2) and (b).[4] According to Richardson, evidence of the prior history of Van Der Molen and Nichols was admissible to show his state of mind in support of his claim that he was acting in defense of Nichols and the children and to establish Nichols' motive and intent for his assertion that she fired the second, fatal, shot to Van Der Molen's head.[5] The court did not rule on the admissibility of the evidence before trial nor did the court rule when asked again before the state's opening state-

4. Richardson's memorandum's offer of proof included a list of 36 specific allegations, including:
Heather Nichols was charged with domestic assault against Robert Van Der Molen in Montezuma, Iowa[;]
* * * Heather Nichols * * * wanted [Kevin Blackston] to arrange for Bob's death with and [sic] acquaintance he had[;]
Kevin Blackston received confirmation from Robert Van Der Molen that Heather had tried to poison him once before[;]
On 10–23–96 Robert Van Der Molen was arrested for and convicted of domestic abuse of Heather Nichols. * * * Ms. Nichols told police [at this time] that she was scared of Robert Van Der Molen and that when he gets out of jail he will kill her[;]
In 1999 Robert Van Der Molen was arrested for domestic abuse [against Nichols] in Dakota County. There were also a number of alleged violations of orders for protection and domestic assault incidents [against Nichols] in Lakeville, Minnesota in 1999[;]
Robert Van Der Molen had threatened to kill Heather Nichols[;]
Nichols had restraining orders against Robert Van Der Molen in both Iowa and Eagan, Minnesota[;] * * *
Mr. Van Der Molen was charged with two incidents of domestic assault against Heather Nichols in 1996 and 1998 in Knoxville, Iowa[;]
Mr. Van Der Molen was charged in Marion County with Harassment, Domestic Abuse, Assault and Violation of a No Contact Order[;]

* * * Heather Nichols [told] Bob Van Der Molen * * * "I will take you out[.]"; * * *
* * * [O]ne evening in August 2000 * * * there were phone calls coming in every 5 minutes for two hours, all from Robert Van Der Molen. One time Joe Rinne [Richardson's friend] answered the phone and Robert Van Der Molen said, "think you're pretty tough, huh?"[;]
Tim Blake was told by Heather Nichols that Robert Van Der Molen beat her and that she was scared of him[;]
* * * [Nichols] disliked [Van Der Molen] a great deal and did not want him anywhere around[;] * * *
* * * [Richardson] and [Nichols] met with Mr. LaCour [the principal at J.A. Johnson Elementary School in Two Harbors] and told him that Robert Van Der Molen posed a threat to her children[;] * * *
Van Der Molen was known to have lots of guns, always carried a gun and was feared by townsfolk and police[;]
Heather Nichols warned Jamie Richardson that Robert Van Der Molen was going to come up * * * and kill * * * Jamie Richardson[;] * * *
* * * Van Der Molen beat Heather Nichols and beat the kids[;]
Heather Nichols had shot one of Forrest Richardson's guns and also had moved them in the house.

5. Van Der Molen was shot twice in the head, and the medical examiner testified that either of the two shots would have been fatal.

ment.[6]

After the state rested its case and before Richardson's opening statement, the state requested that defense counsel not be permitted to refer to this character evidence because Richardson had not yet demonstrated its admissibility. Defense counsel responded, asking the court to rule on the admissibility of the character evidence in the context of Richardson's claim that he was relying upon a defense of others defense. Defense counsel made an offer of proof, indicating that Richardson would testify that he knew from Nichols that Van Der Molen had previously abused her and the children and had attempted to kill her; that Nichols told Richardson on January 10 that Van Der Molen had arrived in town with a gun; and that she was afraid he would hurt her and the children. According to defense counsel's verbal offer

of proof, Nichols asked for Richardson's protection, brought a rifle to him, later went with him to buy ammunition for the gun, and helped plan his entry into the apartment to rescue her and the children. Richardson shot the locks off the door and entered, firing a shot when Van Der Molen threatened to throw Nichols' daughter over the banister.[7] Richardson indicated that counsel's recitation was "pretty accurate" and that he would add to it on the stand. The court ruled that, even if Richardson testified consistent with his offer of proof, the court would not instruct the jury on defense of others, and, thus, character evidence would not be admissible to support his defense of others claim. Defense counsel agreed not to use either Van Der Molen's or Nichols' character evidence in his opening statement.

6. Because the court had not yet ruled on the admissibility of the character evidence, when Nichols was subjected to cross examination by defense counsel, counsel could not examine her regarding what she had told Richardson about her past relationship with Van Der Molen. Defense counsel did ask Nichols whether she ever touched the rifle that shot Van Der Molen; she denied it.

7. Counsel made the offer of proof on the record:

Mr. Richardson * * * knew a lot about Robert Van Der Molen * * * from his wife. He knew that Robert Van Der Molen * * * was someone who had abused his children * * * [and] his wife Heather. He knew that there was a long history between Robert Van Der Molen and his wife getting together, going apart. There was a number of instances in which she had told him that Mr. Van Der Molen had done things that bordered on attempting to kill her * * *. On the evening of January 10th, he came to town. He was pulled over by his wife on 7th Avenue by the liquor store. * * * He pulled over because she appeared to be frantic. * * * She told him that Robert Van Der Molen had come up from Iowa, * * * [that] he had a gun with him, that she

was afraid that he was going to hurt her and the kids. In essence, she asked him to come and help her protect herself and her children from Mr. Van Der Molen. They devised a plan. * * * And they met again after they met in the liquor store parking lot. His wife brought out a rifle that she had taken from his father's house. * * * [T]hey [went] up to the Holiday Station to buy some shells * * *. He was then to return to the home about 1:00 o'clock. * * * He shot the locks off. * * * When he started to walk up the steps Mr. Van Der Molen was standing at the middle stairway, at the middle landing. * * * Mr. Richardson * * * can see Heather fighting with Robert Van Der Molen and Robert Van Der Molen has the child Autumn in one of his hands as if trying to keep the child away from Heather. And it also appeared that he was standing by the banister and that the child may be thrown or tossed over the balcony[.] * * * Mr. Richardson told Mr. Van Der Molen, put Autumn down, put her down, and he held Autumn away becoming more menacing. * * * It appeared that after he had told him, while he was pointing the rifle at him, that he was not going to put Autumn down, that he was going to throw Autumn over the banister, he fired a shot at him.

The court and counsel addressed the admissibility of Van Der Molen's and Nichols' character evidence again before Richardson recalled Nichols to testify. Defense counsel argued that in order to show Richardson's state of mind at the time of the incident, he needed to ask Nichols about what she had told Richardson about Van Der Molen. At this point, the court made its definitive ruling on the admissibility of the character evidence. The court explained that he had not said that Richardson could not testify in accord with his offer of proof.[8] Nor had the court said that Richardson could not testify that Richardson met with Nichols twice that evening, that Nichols brought him a gun, that they went together to the store where Richardson bought ammunition, and that Richardson was at the apartment because Nichols told him she was afraid of Van Der Molen and wanted him to rescue her and the children. The court said that even if Richardson testified in accord with his offer of proof, he would not be entitled to a jury instruction on defense of others, but that did not preclude him from testifying as to his version of events. As for the theory that Nichols fired the second shot, the court repeated that it would not preclude Richardson from telling his version of the facts but that Richardson could not "get into what he may or may not have heard from [Nichols] concerning the basis for it."

Richardson did not testify.[9] In closing argument, the state characterized Van Der Molen as "the one steady reliable presence" in Nichols' life.

Richardson pled guilty to the firearm charge, and the jury acquitted him of the attempted murder charges. The jury found Richardson guilty of the remaining charges. The court entered judgments of conviction and sentenced Richardson to two concurrent terms of life imprisonment for the murder offenses and a concurrent 60 months for the crime of possession of a firearm by a felon. The court sentenced him to consecutive terms for the assault and kidnapping offenses and departed upward from the sentencing guidelines to double the sentences for these offenses for a total of 672 consecutive months. The court indicated that several factors supported the upward departure: the invasion of a zone of privacy, the fact that children were present and terrorized, the duration of the incident, and the fact that Richardson did not give himself up until he was shot. The court did not identify the factors supporting an upward double durational departure for each sentence.

## II.

We first address Richardson's argument that the trial court violated Richardson's due process right to present a defense by not allowing him to introduce character evidence tending to prove that he was acting in defense of others, that he did not act with premeditation and that Nichols

---

**8.** The court said:

I don't know how the Court can preclude him from saying this is what happened, telling his version of the events. I don't know that that means you can go into why I felt that way but really, I don't think there's anything to preclude you from saying what you said in your offer of proof.

**9.** Richardson chose not to testify after counsel thoroughly explained his right to testify:

Your Honor, based solely on the ruling yesterday, I do not feel I'll be able to testify completely to the facts as they stand in this case. Because this ruling has now forced me to omit the most important part of my testimony, I do not feel the truth can be told with the limits that the Court has placed on me and other witnesses that would have been called in this case. So, I am not going to testify based on that fact there.

fired the second shot to Van Der Molen's head.

■ Due process requires that every defendant be " 'afforded a meaningful opportunity to present a complete defense.' " *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *accord* U.S. Const. amend. XIV, § 1; Minn. Const. art I, § 7. This means that the defendant has the right to present the defendant's version of the facts through the testimony of witnesses. *Richards*, 495 N.W.2d at 194 (citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). The right to present a defense is not without limitations, however—in exercising this right, both the accused and the state must comply with procedural and evidentiary rules designed to ensure "both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 195 (citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

■ Where a defendant complains that the exclusion of evidence was error, an offer of proof provides the evidentiary basis for a trial court's decision. *Santiago v. State*, 644 N.W.2d 425, 442 (Minn.2002). We will not reverse such rulings absent a clear abuse of discretion. *State v. Nunn*, 561 N.W.2d 902, 906–07 (Minn.1997). Under this standard, "[r]eversal is warranted only when the error substantially influences the jury's decision." *Id.* at 907. In other words, we will reverse when there is a reasonable possibility that, had the erroneously excluded evidence been admitted, the verdict might have been more favorable to the defendant. *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994).

■ If a trial court's evidentiary ruling is determined to be erroneous, and the error reaches the level of a constitutional error, such as denying the defendant the right to present a defense, our standard of review is whether the exclusion of evidence was " 'harmless beyond a reasonable doubt.' " *Id.* at 102 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 683–84, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), for harmless error impact analysis); *accord State v. Juarez*, 572 N.W.2d 286, 291 (Minn.1997) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The error cannot be said to be harmless beyond a reasonable doubt, and is therefore reversible, where "there is a reasonable possibility that the [error] complained of may have contributed to the conviction." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824.

Richardson's argument that he was denied the right to present a defense is three-fold. He first argues that the trial court erred in excluding character evidence because this information was admissible and relevant to his defense of others defense—he came to the apartment to rescue Nichols and the children because they were in danger and fired the first shot, striking Van Der Molen in the head. Second, Richardson contends the excluded character evidence was relevant to the issue of premeditation. Additionally, Richardson contends that the trial court's ruling was error because it excluded character evidence that tended to establish Nichols' motive and intent to fire the second shot to Van Der Molen's head.

■ To excuse or justify homicide under Minn.Stat. §§ 609.06 and 609.065 (2002), the "killing must have been done in the belief that it was necessary to avert death or grievous bodily harm"; the "judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances"; the "defendant's election to kill

must have been such as a reasonable man would have made in light of the danger to be apprehended." *State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969); *see* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.5(b) (2d ed.2003) (even when defendant's beliefs as to the gravity of the peril and necessity of force are reasonable, "he may not use more force than he reasonably believes necessary to relieve the risk of harm."). "[J]ustification for homicide in defense of another parallels defense of self." *State v. Granroth,* 294 Minn. 491, 492, 200 N.W.2d 397, 399 n. 2 (1972). Ordinarily, the one who is the aggressor, provoking the difficulty in which he finds it necessary to use deadly force, has no right to claim self-defense. *Bellcourt v. State,* 390 N.W.2d 269, 272 (Minn.1986).

■ Here, the trial court considered Richardson's offer of proof and concluded that evidence of Van Der Molen's character was not admissible in support of any claim that Richardson was defending Nichols and her children. According to Richardson's offer of proof, he and Nichols purchased ammunition the evening of January 10; he arrived at Nichols' apartment in the early morning hours of January 11 with a loaded rifle; and pursuant to their plan, he shot the locks off the door. After Van Der Molen allegedly kicked Richardson down the stairs, causing Richardson to lose his glasses, Richardson started up the stairway; and as Van Der Molen was holding the two-year-old, Richardson fired at Van Der Molen, believing he had hit Van Der Molen in the chest. Not only was Richardson the aggressor, but also the use of deadly force was totally without reason. We have no difficulty in concluding that the trial court did not err in concluding that the defense was not available under the offer of proof.

■ Richardson nonetheless argues that evidence of Van Der Molen's character was relevant to the issue of premeditation. If specific instances of conduct of the victim are offered by the defendant to prove the defendant had a reasonable apprehension of harm, the evidence may be admissible if the prior conduct indicates a violent or quarrelsome disposition and if the defendant is aware of the prior conduct. *State v. Bland,* 337 N.W.2d 378, 383 (Minn.1983) (citing *State v. Taylor,* 258 N.W.2d 615 (Minn.1977)). In that Richardson offered no testimony as to his awareness of the victim's prior specific incidents of misconduct, there was no error in excluding the evidence. *Cf. State v. Irby,* 368 N.W.2d 19, 22–23 (Minn.App. 1985) (prior incidents of victim's misconduct admitted to show defendant's state of mind where, prior to court's ruling, defendant testified in chambers that he was aware of the incidents; other incidents of which defendant was not aware were excluded).

Nevertheless, we take a dim view of the state's elicitation of evidence of Van Der Molen's good character. After requesting the trial court to exclude evidence pertaining to the tumultuous relationship between Van Der Molen and Nichols, the state asked Nichols: "And why did you call Van Der Molen? I mean why was it you specifically called him?" This prompted Nichols' reply: "Because he always came to my rescue." After having successfully excluded the character evidence offered by Richardson, in closing argument, the state referred to Van Der Molen as "the one steady reliable presence in [Nichols'] and the kids' lives." We believe the state's elicitation of evidence of Van Der Molen's good character "opened the door" to the evidence offered by the defense to rebut the same.

■ But even assuming error in the exclusion of evidence of the victim's prior incidents of misconduct, under our case law, Richardson's proffered version of his conduct—including buying ammunition, arriving at the apartment armed several hours after meeting with Nichols, and shooting off the locks to enter the apartment—is overwhelming evidence of the elements of first-degree murder, including the element of premeditation. *See, e.g., State v. Voorhees,* 596 N.W.2d 241, 247–48, 253 (Minn.1999) (bringing rifle to estranged wife's place of work and approaching her when she went outside to smoke supported inference of premeditation); *Moore,* 481 N.W.2d at 361–62 (removing shotgun from storage under bed, loading it, and placing it on living room shelf before the killing showed planning). If the verdict is "surely unattributable" to the error, then the error is harmless beyond a reasonable doubt. *Juarez,* 572 N.W.2d at 292. In other words, we must be satisfied "beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, an average jury (i.e., a reasonable jury) would have reached the same verdict." *Post,* 512 N.W.2d at 102 (footnote omitted). A thorough review of this record, together with a consideration of all relevant factors, compels the conclusion that beyond a reasonable doubt the exclusion of Van Der Molen's character evidence did not have a significant impact on the verdict in this case. On a different record in a different case, of course, we might conclude otherwise.

■ Richardson also argues that the trial court erroneously excluded evidence of Nichols' prior misconduct because it was relevant to his defense that Nichol's fired the second and fatal shot. The medical evidence was that Richardson was shot twice in the head and that either one of the shots would have been fatal.

■ In a criminal prosecution, evidence of other crimes alleged to have been committed by the defendant is inadmissible under Minn. R. Evid. 404(b) to prove the defendant's character in order to show that he acted in conformity therewith in the present case. Such evidence may be admitted, however, "to establish motive, intent, absence of mistake or accident, identity or common scheme or plan." *State v. Slowinski,* 450 N.W.2d 107, 113 (Minn.1990) (citing *State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965)). In determining the admissibility of Rule 404(b) or *Spreigl* evidence, the trial court must find (1) that the evidence is clear and convincing that defendant participated in the *Spreigl* offense, (2) that the *Spreigl* evidence is relevant and material to the state's case, and (3) that the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice. *State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991) (citing *State v. Norris,* 428 N.W.2d 61, 69 (Minn.1988)); *see also State v. Bolte,* 530 N.W.2d 191, 196–97 (Minn. 1995) (detailing procedural requirements and safeguards governing other-crimes evidence).

■ The defense is also entitled to offer evidence of other crimes or acts by a third person to cast reasonable doubt on the state's claim of the defendant's guilt. *State v. Bock,* 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). Such evidence is sometimes referred to as "reverse–404 (b)," "third-party perpetrator," "third-party culprit," "alternative perpetrator," "alleged alternative perpetrator," or in Minnesota "reverse-*Spreigl*" evidence. *See State v. Johnson,* 568 N.W.2d 426, 433 (Minn.1997); David McCord, *The Admissibility of Evidence Offered by a Criminal Defendant to Suggest That Someone Else is Guilty,* 63 Tenn. L.Rev. 917, 920 (1996);

1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 115, at 684 (2d ed.1994).

Rule 404(b) makes no distinction between the other crimes or acts of a defendant and those of another, and we have indicated that the same basic admissibility analysis applies in either situation. *State v. Robinson*, 536 N.W.2d 1, 2 (Minn.1995). But we have also recognized that "Sixth Amendment concerns (right to confront one's accuser and right to present evidence) enter into the picture when it is the defendant who is seeking to present the evidence." *Id.* at 2; *see also* McCord, *supra* at 985 ("If the constitutional right to a fair opportunity to defend against the charge means anything, it must empower a court to override a state evidence rule that would bar the defendant from presenting evidence that could create a reasonable, non-speculative doubt about the defendant's guilt."). When the defendant offers other-crimes evidence relating to a third party, "the pragmatic relevance standard embodied in [Rules 401–403] should apply, and the focus should be on whether the evidence is relevant" to cast reasonable doubt on the state's case

> since risks of unfair prejudice do not appear or take on a very different shape. There is no possibility of arousing the jury in ways that would be harmful to the third person, and the remaining risk is that the jury may overvalue the evidence and acquit a guilty defendant. Giving defendants more leeway in this setting seems appropriate, although the result is not so easily squared with the terms of [FRE 404], since admitting such evidence under the pragmatic relevancy standard may infringe the principle barring the general propensity evidence.

1 Mueller & Kirkpatrick, *supra* at 685.

■ That defendants should be afforded leeway in the admission of other-crimes evidence, however, does not mean that the "defendant should be allowed to throw strands of speculation on the wall and see if any of them will stick." McCord, *supra* at 984. At the preliminary fact stage, to avoid the consideration of matters collateral to the crime, the trial court must be satisfied that there is a direct connection between the third party and the charged crime:

> "The rule is that (evidence of such acts) by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." *Marrone v. State*, 359 P.2d 969, 984 (Alaska 1961). *Accord, State v. Lilja*, 155 Minn. 251, 256, 193 N.W. 178, 180 (1923); Annotation, 121 A.L.R. 1362, 1363. That is, evidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime. This requirement avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased.

*Hawkins*, 260 N.W.2d at 159; *see* McCord, *supra* at 921 ("direct connection doctrine" provides that third-party perpetrator evidence is not admissible "unless the defendant establishes, as a matter of preliminary fact, a direct connection between the [alleged alternative perpetrator] and the crime so as to raise more than a mere suspicion that the [alleged alternative perpetrator], not the defendant, was the perpetrator.").

■ Certainly matters of credibility and inference are for the jury; but in determining preliminary questions of fact in the admissibility of evidence, the trial court need not disregard the evidence already admitted. Here, two days before

the shooting, Nichols obtained a domestic abuse restraining order against Richardson, moved with the children from the family home into transitional housing and called Van Der Molen in Iowa, requesting that he come and get her and the children. After the shooting of Van Der Molen, Richardson held Nichols and her daughter hostage, shooting at police who surrounded the building and yelling "I killed once and I'll do it again." Ordinarily, more than mere presence at the crime scene is needed to establish the requisite nexus between the third party and the charged crime for purposes of admitting third-party crimes. *E.g., State v. Phelps*, 328 N.W.2d 136, 137–38 (Minn.1982) (requisite nexus established on forensic evidence that victim's brother and the defendant dragged the victim's body to the place where it was found, brother feigned lack of knowledge of the events surrounding victim's death, and brother later pleaded guilty to manslaughter related to killing his former girlfriend in return for immunity in the death of his sister and testimony against the defendant).

Moreover, Richardson's proffered other-crimes evidence was neither crucial nor exculpatory. According to Richardson's offer of proof, he was aware that Nichols had assaulted Van Der Molen and tried to arrange his death; but nevertheless he accepted the rifle that Nichols' took from his father's house, accompanied her to the gas station where he purchased ammunition and several hours later brought the rifle, now loaded, into Nichols' apartment as part of a "rescue mission." Under Minnesota law, a defendant charged as an accomplice to first-degree murder is not required to have predicted that a companion would murder the victim. Rather, the question is whether the murder was reasonably foreseeable as a probable consequence of the intended crime which apparently by the offer of proof here was at least a felony-level assault. *State v. Pierson*, 530 N.W.2d 784, 789 (Minn.1995) (murder was reasonably foreseeable consequence of aggravated robbery so as to permit accomplice liability for first-degree murder committed by co-defendant); Minn.Stat. § 609.05, subd. 2 (2002). The proffered alternative-perpetrator theory arguably could have prompted an amendment to the indictment to include, or instructions on, aiding and abetting first-degree murder. *See State v. Ostrem*, 535 N.W.2d 916, 922 (Minn.1995) (sua sponte instruction on aiding and abetting, where aiding and abetting was not originally charged, was not an impermissible amendment to the complaint). Accordingly, the trial court could reasonably have concluded that the risk of confusing the issues and wasting time outweighed the likely value to Richardson of any inference that could conceivably have been drawn from Nichols' prior misconduct where the defense theory would not have absolved Richardson of accomplice liability for the murder.[10]

---

10. This case does not concern, as the concurrence/dissent suggests, two types of alternative-perpetrator evidence with differing standards for admissibility. This case concerns the admissibility of third-party-crimes evidence offered by a criminal defendant to cast a reasonable, nonspeculative doubt as to the defendant's guilt. In analyzing the admissibility of this evidence, Minnesota has long relied on the direct connection doctrine which is "really a specialized application of the balance between probative value and countervailing considerations at the preliminary fact stage." David McCord, *The Admissibility of Evidence Offered by a Criminal Defendant to Suggest That Someone Else is Guilty*, 63 Tenn. L.Rev. 917, 975 (1996). The Rule 404(b) requirement that other-crimes evidence be "clear and convincing" is primarily aimed at providing a procedural safeguard for the defendant when it is the state that offers the other-crimes evidence. *See State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967). It may very well be that

## III.

Richardson next argues that the trial court violated his due process right to testify by not allowing him to testify as to his intent. Richardson does not argue that his waiver was not voluntary and knowing. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Indeed, Richardson's counsel thoroughly explained his right to testify on the record, and Richardson chose not to testify. Instead, Richardson argues that the court's evidentiary ruling, *see supra* note 8, which prevented him from testifying as to Van Der Molen's and Nichols' character evidence, including prior bad acts, emasculated his potential testimony and caused him to decide not to testify.

The right to testify does not mean that the defendant's testimony is unrestricted. *See Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). As a general rule, the defendant must comply with the evidentiary rules. *State v. Richards,* 495 N.W.2d 187, 192 (Minn.1992). When the defendant's right to testify conflicts with a rule of evidence, the constitution demands that restrictions imposed on that right "not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock,* 483 U.S. at 56, 107 S.Ct. 2704. Here, the court repeatedly told Richardson that he could testify to his version of the events, both as to justification and Nichols as a perpetrator; and the court indicated that evidence of Nichols' prior misconduct might become relevant if Richardson or someone else testified that she fired the second shot. The court's evidentiary rulings did not deprive Richardson of his right to testify.

## IV.

We turn now to Richardson's argument that the boys' hearsay state-

ments, admitted by the trial court as excited utterances, were inadmissible because the declarants lacked personal knowledge. *See* Minn. R. Evid. 602, 803(2). Richardson does not dispute that the statements themselves qualify as excited utterances. On appeal, Richardson bears the burden of proving that the admission of these statements was erroneous; we will not reverse "absent a clear abuse of discretion." *State v. Rhodes,* 627 N.W.2d 74, 84 (Minn.2001).

Rule 602 requires *witnesses* to have firsthand knowledge and does not specifically refer to declarants of hearsay statements. Minn. R. Evid. 602. Courts require that declarants of a hearsay statement have firsthand knowledge before the hearsay statement is admissible, however. *See State v. Ferguson,* 581 N.W.2d 824, 832 (Minn.1998) (citing Minn. R. Evid. 602, comm. cmt.); *see also Miller v. Keating,* 754 F.2d 507, 511 (3d Cir.1985) ("Direct proof of perception, or proof that forecloses all speculation is not required. On the other hand, circumstantial evidence of the declarant's personal perception must not be so scanty as to forfeit the 'guarantees of trustworthiness' which form the hallmark of all exceptions to the hearsay rule."); *McLaughlin v. Vinzant,* 522 F.2d 448, 453–54 (1st Cir.1975) (requiring "an apparent opportunity to observe" not " 'direct evidence beyond any possibility of speculation that the declarant personally observed the matters' ") (quoting *People v. Poland,* 22 Ill.2d 175, 174 N.E.2d 804, 808 (1961), which cites 6 Wigmore, *Evidence,* § 1751 (3d ed.)). The party offering a statement has the burden of proving personal knowledge. *Ferguson,* 581 N.W.2d at 832.

Here, it is indisputable that the boys were in the apartment at the time of the

---

in certain situations this rule may have the potential to operate unconstitutionally upon

the right to present a defense, but that is not the case here.

shooting. From the inside of the closet, they heard Richardson fire the first shot at Van Der Molen's head. Nichols testified that the boys came out of the closet before the second shot was fired, that they could see Van Der Molen from where they were standing, and that they watched Richardson fire the second shot. It was not an abuse of discretion for the trial judge to conclude that the personal knowledge requirement was satisfied and to admit the boys' statements as excited utterances.

## V.

█ Next we consider Richardson's contention that the jury should have been instructed on two lesser-included offenses—intentional discharge of a firearm and reckless discharge of a firearm—for the first-degree assault offenses. Richardson made a timely request for jury instructions on the lesser offenses, which the trial court denied.

█ A trial court, having the ultimate responsibility to ensure that all essential instructions are given, must submit an instruction on a lesser-included offense when: (1) the offense in question is an included offense, Minn.Stat. § 609.04 (2002); *State v. Leinweber,* 303 Minn. 414, 421–22, 228 N.W.2d 120, 125–26 (1975); and (2) a rational basis exists for the jury to convict the defendant of the lesser-included offense and acquit the defendant of the greater crime. *Leinweber,* 303 Minn. at 422, 228 N.W.2d at 125–26. There is no rational basis for an acquittal on the offense charged and a conviction on the lesser offense where the " 'proof of the elements which differentiate the two crimes [are not] sufficiently in dispute so that a jury' may make this distinction." *Bellcourt v. State,* 390 N.W.2d 269, 273 (Minn. 1986) (quoting *State v. Adams,* 295 N.W.2d 527, 532 (Minn.1980)). A trial court's failure to instruct the jury on a lesser-included offense when requested is reversible error unless the trial court properly exercised its discretion and the defendant suffered no prejudice. *See Leinweber,* 303 Minn. at 422, 228 N.W.2d at 126.

In this case, the parties dispute whether jury instructions on the two firearm charges should have been given. Richardson argues that the firearm charges are lesser-includeds because "[i]n determining whether an offense is a necessarily included offense, we must look at the elements of the offense rather than the facts of the particular case." *Roden,* 384 N.W.2d at 457. The state contends that there is no rational basis for an acquittal on the offense charged and a conviction on the lesser offense. *State v. Murphy,* 380 N.W.2d 766, 772 (Minn.1986).

The assault offense requires proof that: (1) the defendant assaulted a peace officer; (2) the peace officer was engaged in his duties as an officer at the time of the assault; and (3) the defendant used deadly force against the officer. Minn.Stat. § 609.221, subd. 2 (2002). Deadly force includes the intentional discharge of a firearm in the direction of a person. Minn. Stat. § 609.066, subd. 1 (2002). Intentional discharge of a firearm requires proof that the defendant intentionally discharged a firearm in a manner that endangered the safety of another person. Minn.Stat. § 609.66, subd. 1a(2) (2002). Reckless discharge of a firearm within a municipality requires proof that the defendant intentionally discharged a weapon in a municipality in a manner that the defendant should have known created an unreasonable risk of harm to others. Minn.Stat. § 609.66, subd. 1a(a)(3) (2002); 10A Minn. Dist. Judges Ass'n, *Minnesota Practice— Jury Instruction Guides, Criminal,* CRIMJIG 32.10 (1999).

Given the facts of this case, which we have summarized above, we are satisfied

that no rational basis existed for the jury to convict Richardson of the lesser-included offenses and acquit him of the greater crime. *See Leinweber,* 303 Minn. at 421–22, 228 N.W.2d at 125–26. Thus, the trial court properly exercised its discretion in not instructing the jury on the lesser-included offenses.

## VI.

Richardson also challenges his sentences as both unduly exaggerating the seriousness of the offenses and improper departures.

Richardson was sentenced to two concurrent terms of life in prison for the two first-degree murder convictions; two consecutive terms of 240 months for the assault offenses; and two consecutive terms of 96 months for the kidnapping offenses. Richardson also received a concurrent term of 60 months for the felon in possession of a firearm offense. The court relied on the "zone of privacy," *State v. Kindem,* 338 N.W.2d 9, 17–18 (Minn.1983), and the fact that children were present, *see State v. Miller,* 488 N.W.2d 235, 241 (Minn. 1992), as departure factors. Richardson's total sentence was life plus 672 months, which represents double upward departures for the assaults and kidnapping offenses.

At the outset, Richardson argues, and the state concedes, that only one judgment of conviction should be entered and one sentence imposed for the first-degree murder of one victim. *See* Minn.Stat. § 609.04 (2002); *State v. Pippitt,* 645 N.W.2d 87, 96 (Minn.2002). We therefore vacate the conviction for first-degree felony murder and affirm the conviction and life sentence for first-degree premeditated murder.

Richardson also contends that his remaining aggregate sentence—which includes consecutive sentences and upward durational departures—unduly exaggerated the seriousness of his offenses and, therefore, should be reduced.

Consecutive sentencing of multiple felonies with multiple victims is permissive and within the broad discretion of the trial court. Minn. Sentencing Guidelines II.F.2 (providing that "[m]ultiple current felony convictions for crimes against persons may be sentenced consecutively to each other"); *see Bangert v. State,* 282 N.W.2d 540, 546 (Minn.1979) ("In appropriate cases, [consecutive] sentences serve the valid legislative purpose of protecting the public."); *see, e.g., State v. Whittaker,* 568 N.W.2d 440, 453 (Minn. 1997) (affirming multiple consecutive sentences in a case involving multiple victims; life sentence for first-degree murder, a consecutive 180–month term for first-degree attempted murder, six 36–month terms consecutive to the 180–month term and to each other for the second-degree assaults, and a concurrent 108–month term for first-degree burglary). An appellate court looks to past sentences imposed on other offenders when determining the propriety of consecutive sentencing. *Miller,* 488 N.W.2d at 241. Our standard of review is abuse of discretion. *State v. Swanson,* 498 N.W.2d 435, 440 (Minn.1993).

In *Bangert,* we affirmed two consecutive life sentences for the defendant's conviction for the first-degree murders of his half-sister and her husband. 282 N.W.2d at 547. In *State v. Norris,* we modified a sentence of life imprisonment plus five consecutive terms of 60 months each where the defendant was convicted of six separate crimes: first-degree murder of one victim and five counts of second-degree assault of five separate victims. 428 N.W.2d 61, 70–71 (Minn.1988). We said:

The sentence given Norris is technically permissible, and he conceded that this is so. Our review of the cases leads us to conclude, however, that the consecutive application of five terms of 60 months each for a total of 300 months, added to a sentence of life imprisonment for murder in the first degree, on the facts and circumstances of this case, unfairly exaggerated the criminality of defendant's conduct. We modify the sentence by holding that three of the five sentences for aggravated assault be served concurrently.

428 N.W.2d at 71. Given the facts and circumstances of this case, we cannot say the trial court abused its discretion in imposing consecutive sentences.

 Additionally, Richardson challenges the upward durational departures, asserting that no factors were cited in support of the sentencing departures for the assaults and that the departures for the kidnappings were improper. For each offense, there must be substantial and compelling reasons to depart from the Minnesota Sentencing Guidelines' presumptive sentences. *State v. McIntosh*, 641 N.W.2d 3, 8 (Minn.2002); *State v. Williams*, 608 N.W.2d 837, 840 (Minn. 2000). ("[T]he trial court may not rely on conduct underlying one conviction to support departure on a sentence for a separate conviction * * *."). According to the Sentencing Guidelines, "[t]he judge shall utilize the presumptive sentence provided in the sentencing guidelines unless the individual case involves substantial and compelling circumstances. * * * When departing from the presumptive sentence, the court should pronounce a sentence which is proportional to the severity of the offense of conviction * * *." Minn. Sentencing Guidelines II.D. We look to the sentencing court's rationale to determine whether the court abused its discretion.

*McIntosh*, 641 N.W.2d at 8. Thus, we have said that:

1. If no reasons for departure are stated on the record at the time of sentencing, no departure will be allowed.

2. If reasons supporting the departure are stated, this court will examine the record to determine if the reasons given justify the departure.

3. If the reasons given justify the departure, the departure will be allowed.

4. If the reasons given are improper or inadequate, but there is sufficient evidence in the record to justify the departure, the departure will be affirmed.

5. If the reasons given are improper or inadequate and there is insufficient evidence of record to justify the departure, the departure will be reversed.

*State v. Geller*, 665 N.W.2d 514, 516 (Minn. 2003) (quoting *Williams v. State*, 361 N.W.2d 840, 844 (Minn.1985)).

In *Geller*, we held that "absent a statement of the reasons for the sentencing departure placed on the record at the time of sentencing, no departure will be allowed." *Geller*, 665 N.W.2d at 517. While the record reflects that the rationale for the sentencing departure for each kidnapping was appropriate in each case, no separate reasons justifying the sentencing departures for the assaults were made a part of the record at the time of sentencing. Since the record does not establish the presence of separate aggravating circumstances justifying a durational departure on each assault, we reduce the duration of Richardson's prison term to 120 months on each assault conviction, the mandatory minimum term.

Affirmed as modified.

MEYER, Justice (dissenting).

I respectfully dissent. While I concur with the majority's conclusion that Richardson was not entitled to claim defense of others, I cannot agree that it was harmless error to exclude evidence about the nature of the past, violent relationship between Van Der Molen and Nichols. I believe this evidence was relevant to Richardson's state of mind on the question of premeditation and should have been allowed for that purpose. I would conclude that the error was not harmless because the exclusion of this relevant evidence allowed the state to unfairly characterize the relationship between Van Der Molen and Nichols and denied Richardson his right to a fair trial.

At trial, the state presented the following story through Nichols' testimony. Richardson and Nichols had a brief marriage filled with incidents of violence. When Nichols decided to leave Richardson, he became very possessive and jealous, telling her that if she did not stay with him, she would die. In spite of Richardson's threats, Nichols left him and sought help from a local domestic violence shelter, and moved into a transitional housing unit. Nichols testified that after filing a restraining order against Richardson, she called Van Der Molen and told him that "I didn't expect [Van Der Molen] to come to my rescue again but that we had gotten away from [Richardson]." According to Nichols, this was the second time that Nichols had asked Van Der Molen to "rescue" her from Richardson, the first occurring in October of 2000. During cross-examination, when asked why she had called Van Der Molen, Nichols testified:

Because I always called Robert. * * * When things went wrong in any situation throughout the years, I always called Robert. And I called him because I was scared and because I wanted to

get out of there, *I wanted him to come and protect me like he always protected me.*

(Emphasis added.) Nichols then testified that she and Van Der Molen made plans for Van Der Molen to come for her and the children and bring them back to Iowa. The evening of January 10, 2001, Richardson came to the apartment, shot the locks off of the downstairs door, and then shot Van Der Molen twice.

The state's version of the events leading up to Van Der Molen's death was that Richardson had driven by Nichols' apartment, saw Van Der Molen's car, became extremely upset, and then premeditated Van Der Molen's death to ensure that Nichols would never return to Van Der Molen. As the state explained in its closing argument,

[i]f [Richardson] couldn't have Heather Nichols, nobody could. And certainly not Heather's ex-husband Robert Van Der Molen. So the Defendant put two bullets through Robert Van Der Molen's head to make darn sure he couldn't have her. Bob Van Der Molen didn't know what he was in for that day. He came to Two Harbors because of a desperate phone call from his ex-wife. *She had nobody to turn to except for the one steady reliable presence in her and the kids' lives.*

(Emphasis added.)

The defense sought to present a significantly different version of the events leading up to Van Der Molen's death through the following offer of proof. On the evening of January 10, Nichols flagged Richardson down and told him that Van Der Molen had come up from Iowa with a gun, and that she was afraid that Van Der Molen was going to hurt her and the children. Nichols asked Richardson to come to the apartment that evening to get her and the children away from Van Der Mol-

en. Nichols and Richardson agreed to meet later that evening. When they met, Nichols gave Richardson a gun and asked him to buy shells for it. She told Richardson she was afraid of what Van Der Molen might do to her and the children. After buying the shells, Nichols and Richardson agreed that Richardson would come to the apartment that evening for the purpose of rescuing her from Van Der Molen. When Richardson arrived that evening, he found the downstairs door locked, and as agreed, he shot the locks off the door so that he could enter and retrieve Nichols and the children. According to the defense, there was never any intent to kill Van Der Molen and, therefore, no premeditation, because when Richardson came to the apartment he had not intended to use the gun against Van Der Molen.

According to the defense, Richardson was at the apartment solely because Nichols had asked Richardson to come and save her from Van Der Molen. Although Richardson had never met Van Der Molen, Nichols had told Richardson that Van Der Molen had abused the children, abused her, and threatened to kill or strangle her.

Richardson was prepared to testify about his understanding of the violent relationship between Van Der Molen and Nichols, and his attorney was prepared to argue that the killing was not premeditated. The defense was also prepared to question Nichols about what she had told Richardson about Van Der Molen's violent past. The defense offered evidence that Van Der Molen had been charged with or convicted of domestic abuse against Nichols on multiple occasions, and that Nichols had restraining orders against Van Der Molen. In particular, the defense sought to admit the following:

Nichols was charged with domestic assault against Van Der Molen in Montezuma, Iowa, in 2000.

Van Der Molen was convicted in 1996 of misdemeanor domestic abuse against Nichols. In the police report regarding this incident, Nichols told police that she was afraid of Van Der Molen and that when he gets out of jail he will kill her. Van Der Molen was arrested for misdemeanor domestic abuse in Dakota County in 1999. The Lakeville Police Department had a number of records on Van Der Molen and Nichols from 1999, alleging violations of protection orders, and domestic assault incidents.

Van Der Molen was charged with two incidents of domestic assault against Nichols in 1996 and 1998 based on the handwritten notes on court records from the Marion County Clerk of Court in Knoxville, Iowa.

Marion County Clerk of Court records contain numerous charges against Van Der Molen for interference with official acts, harassment, domestic abuse, assault, and violation of no contact order. An emergency (ex parte) order for protection dated September 7, 2000, in Lake County District Court entitled "Heather L. Nichols v Robert L. Van Der Molen."

Despite an offer of proof for this evidence, the district court refused to admit any evidence with respect to what Richardson knew about Van Der Molen and Nichols' relationship when he arrived at the apartment on January 10, 2001, even though the defense explained that "the only purpose of most of this evidence, prior evidence, * * * goes to show my client's state of mind, which is the reason or at least is the basis upon which he went to the apartment." The court restricted Richardson's ability to testify, apparently believing that without a self-defense claim, the evidence was irrelevant. Without the self-defense theory, the court stated: "I don't know that there's any other theory

that under those circumstances that you could get that evidence in." The court never explained why the proffered evidence was inadmissible to attack the state's proof that Richardson premeditated the murder.

The majority applies a harmless error analysis and concludes that even though the district court's restrictive ruling may have been an abuse of discretion, the error was harmless because even under Richardson's version there was "overwhelming evidence of premeditation." I would conclude that the district court's exclusionary ruling reaches the level of constitutional error and calls for a heightened standard of review; i.e., whether the exclusion of evidence was "harmless beyond a reasonable doubt." *State v. Juarez,* 572 N.W.2d 286, 290 (Minn.1997). The error is not harmless beyond a reasonable doubt where "there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Under both the United States and Minnesota Constitutions, every criminal defendant has the right to "be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). This includes the opportunity to be heard, as well as the right to offer the testimony of witnesses so that the defense can present its version of the facts to the jury for the jury to decide the truth. *See State v. Quick,* 659 N.W.2d 701, 712–13 (Minn. 2003); *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (concluding that this opportunity would be empty "if the State were permitted to exclude competent, reliable evidence bear-

ing on the credibility of a confession when such evidence is central to the defendant's claim of innocence").

It is "fundamental that criminal defendants have a due process right to explain their conduct to a jury." *State v. Brechon,* 352 N.W.2d 745, 751 (Minn.1984). Even though this right is limited by rules of evidence, we have concluded that "the defendant's constitutional right to give testimony regarding his intent and motivation is very broad." *State v. Buchanan,* 431 N.W.2d 542, 550 (Minn.1988). "Courts must scrutinize with the greatest care any restrictions on a defendant's testimony offered in * * * defendant's own behalf as to his or her intent and the motivation underlying that intent lest we jeopardize the federal and state constitutional right to a fair trial." *Brechon,* 352 N.W.2d at 752 (Wahl, J., concurring). The right to give testimony on one's own behalf has sources in several provisions of the Constitution. *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The Supreme Court has found the right to testify under "the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law"; the Compulsory Process Clause of the Sixth Amendment, which encompasses the defendant's right to call witnesses and the right to call himself as a witness; and the Sixth Amendment, which provides an accused the fundamental "right to present his own version of events in his own words." *Rock,* 483 U.S. at 51–52, 107 S.Ct. 2704.

By virtue of the court's evidentiary rulings, the defendant was unable to fully and meaningfully present his own version of events, which afforded Nichols the opportunity to unfairly describe Van Der Molen as the person who had always "rescued" her from bad situations. Richardson chose not to testify when it became clear

that his claim that he did not intend to kill Van Der Molen would be unbelievable without the opportunity to place it within a meaningful context. As the defendant himself noted to the district court, without the opportunity to fully challenge Nichols' story, his claim that he went to rescue Nichols from Van Der Molen was completely lacking in believability, and he was unfairly prevented from telling his whole story. The unfairness of the evidentiary ruling was intensified by the closing argument of the state, to the effect that Van Der Molen was "the one steady reliable presence in her and the kids' lives."

In sum, the effect of the district court's ruling was to deprive Richardson of the right to cast reasonable doubt on the state's case, despite the fact that the prosecution's key witness opened the door to the evidence. I believe we can fairly say that there was a reasonable probability that the exclusion of evidence tending to establish Richardson's state of mind may have contributed to the jury's verdict, in a case where the difference between first-degree murder and second-degree murder is entirely based on the defendant's state of mind. I would reverse Richardson's murder conviction and grant him a new trial.

HANSON, Justice (dissenting).

I join in the dissent of Justice Meyer.

HANSON, Justice (concurring in part, dissenting in part).

Although I join in the dissent of Justice Meyer, I write separately because I conclude that it was also prejudicial error for the district court to exclude alternate-perpetrator evidence without conducting an evidentiary hearing to determine the sufficiency of that evidence. At a minimum, this case should be remanded to the district court to conduct such an evidentiary hearing.

### A. *Alternate–Perpetrator Evidence.*

The majority opinion does not adequately distinguish between the two types of alternate-perpetrator evidence offered by Richardson: (1) his proposed testimony as an eyewitness that Nichols took the rifle from him and fired the second shot; and (2) character evidence that both Nichols and Van Der Molen committed other bad acts, offered to show Nichols' motive and intent to fire the second shot. The former evidence is not properly considered "reverse-*Spreigl* " evidence and its admissibility requires only that it meet the ordinary standard for relevance and foundation. *State v. Bock,* 229 Minn. 449, 458, 39 N.W.2d 887, 892 (Minn.1949); *State v. Hawkins,* 260 N.W.2d 150, 158 (Minn. 1977); *State v. Flores,* 595 N.W.2d 860, 868 (Minn.1999). The latter evidence is properly considered "reverse-*Spreigl* evidence" and is admissible only if it meets the heightened "clear-and-convincing evidence" standard. *State v. Williams,* 593 N.W.2d 227, 233 (Minn.1999); *State v. Johnson,* 568 N.W.2d 426, 433 (Minn.1997). Richardson's proffered testimony as an eyewitness to the shooting would be based on first-hand knowledge and clearly satisfies any foundation requirements. It is relevant because of the dispute in the medical evidence about whether the second shot was fatal. Richardson's proffered reverse-*Spreigl* evidence was relevant to show Nichol's motive and intent.

### 1. *Connecting a Third Party to the Offense.*

The majority acknowledges that Nichols was present at the scene of the crime at the time the second shot was fired, but implies that some evidence beyond Richardson's proffered eyewitness testimony

would be necessary to connect Nichols to the shooting. I disagree. First, we have held that the acknowledgement of the third person that she was present at the scene of the crime provides adequate foundation. *See, e.g., Hawkins,* 260 N.W.2d at 160; *Flores,* 595 N.W.2d at 868 ("We have held that sufficient evidence is offered when the third party was a key witness for the state and was by his own testimony connected to the scene of the crime."). Thus, Nichols' testimony alone would supply the needed foundation. Second, Richardson's proffered testimony not only places Nichols at the scene, it describes her direct participation in the offense.[11]

### 2. Reverse–Spreigl Evidence.

Based on Richardson's proffered evidence connecting Nichols to the scene, Richardson satisfied the foundational requirements for the admission of reverse-*Spreigl* evidence. The reverse-*Spreigl* evidence was relevant to Richardson's claim that Nichols fired the second shot because it showed that an abusive relationship had existed between Nichols and Van Der Molen and that Nichols had previously assaulted him, attempted to poison him, made death threats to him and solicited someone to kill him.

Because the district court focused exclusively on issues relating to the defense of others and not the reverse-*Spreigl* issue, the court did not determine whether Richardson's proffered evidence could meet the clear-and-convincing standard required for reverse-*Spreigl* evidence. Some of Richardson's evidence was based on court rec-

ords that presumably would be regarded as clear and convincing. Other evidence involved statements by Van Der Molen or Nichols to third persons who, Richardson represented, were prepared to testify. The appropriate process for the district court to employ to evaluate the offer of proof of this reverse-*Spreigl* evidence would be to conduct an evidentiary hearing, out of the presence of the jury, to determine whether the proffered evidence was "clear and convincing." *State v. DeWald,* 464 N.W.2d 500, 505 (Minn.1991) (stating "the trial court should consider, in a close case, requiring an evidentiary hearing to determine the admissibility of *Spreigl* evidence rather than relying on the offer of proof procedure"). *See also,* 8 Henry McCarr & Jack Nordby, *Minnesota Practice—Criminal Law and Procedure* § 32.20(C), n. 21 (3d ed.2001) (suggesting "[m]uch can be said for a rule that would require testimony upon the request of the defendant. Without it, it is difficult in many cases to see how the clear-and-convincing determination can be made.").

Richardson's offer of proof described several items of evidence which, on their face, appear adequate to prove Van Der Molen's or Nichol's participation in each of the alleged incidents. There does not appear to be any reasonable basis to determine that the evidence is not clear and convincing without an evidentiary hearing.

### 3. The State's Character Evidence.

Although the state's motion in limine to preclude the reverse-*Spreigl* evidence concerning Van Der Molen and Nichols was

---

**11.** It is true that the district court did not preclude Richardson from testifying as an eyewitness that Nichols fired the second shot. But, I agree with Richardson that the exclusion of the reverse-*Spreigl* evidence had the practical effect of preventing his testimony as an eyewitness. His claimed observations would carry no weight if he could not provide background information to support the motive and intent of Nichols to fire the second shot. Thus, I would conclude that any error of the district court in excluding the reverse-*Spreigl* testimony had the prejudicial effect of preventing Richardson's testimony as an eyewitness to the event.

made prior to trial, the district court did not rule on it until the state had already elicited positive character evidence regarding Van Der Molen and Nichols through the testimony of Nichols. Thus, in addition to the normal reverse-*Spreigl* analysis, the district court was obliged to consider whether the state had opened the door to Richardson's proffered character evidence regarding Van Der Molen and Nichols by eliciting testimony that painted a positive, and perhaps false, picture of the relationship between Van Der Molen and Nichols. Defense counsel alerted the district court to this additional ground for the admission of the reverse-*Spreigl* evidence, stating:

> We also want to point out the credibility question, judge, because she has testified that Mr. Van Der Molen is her protector. And we believe that that also opens up the box that we should be able to go behind. Because every bit of information that my client has about Mr. Van Der Molen comes from her. And now she's claiming, and she claimed that he's been her protector, and I'm boxed out of being able to use any information about her prior involvement with Mr. Van Der Molen and I can't even do it on a credibility issue.

In addition to the positive character evidence recited in the dissent of Justice Meyer, I would note that Nichols also testified that she had stayed in close contact with Van Der Molen after their divorce, that he had always provided support for their children, and they had a joyful reunion when Van Der Molen arrived at the Two Harbors' apartment. Richardson was precluded from presenting evidence of a different, hostile relationship between Van

Der Molen and Nichols. He was even precluded from asking Nichols, on cross-examination, why she had left Van Der Molen if he was such a wonderful protector.

For all of these reasons, I would conclude that the district court erred in excluding the reverse-*Spreigl* evidence described in Richardson's offer of proof without conducting an evidentiary hearing to determine if it was clear and convincing.

### B. *Harmless–Error Analysis.*

It is difficult to apply a harmless-error analysis to alternate-perpetrator evidence without the benefit of a determination by the district court of what evidence meets the clear-and-convincing standard. Thus, I would refer the harmless-error question to the district court as part of a remand.

If the bulk of the reverse-*Spreigl* evidence is determined to be admissible as being clear and convincing, then the error in excluding it would be prejudicial, even under the lesser harmless-error standard applicable to evidentiary rulings that do not amount to constitutional violations. That standard requires reversal if there is a reasonable possibility that the verdict would have been more favorable to the defendant had the erroneously excluded evidence been admitted. *State v. Blasus*, 445 N.W.2d 535, 540 (Minn.1989); *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994). I would conclude that there is a reasonable possibility that the verdict would have been more favorable to Richardson on the two murder charges if the bulk of the reverse-*Spreigl* evidence had been admitted.[12]

---

12. I recognize the partial validity of the majority's rejoinder that Richardson's proffered evidence was "neither crucial nor exculpatory" because it would have provided evidence to convict him of first-degree murder as an accomplice to the acts of Nichols. But this hypothetical requires far greater speculation

Accordingly, if Richardson's murder convictions are not reversed on the grounds set forth in the dissent of Justice Meyer, I would remand for an evidentiary hearing on Richardson's reverse-*Spreigl* evidence to determine, first, which items of evidence should have been admitted because they satisfied the clear-and-convincing standard and, second, whether the exclusion of the admissible evidence was prejudicial error, necessitating a new trial.

MEYER, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Hanson.

than is appropriate for a harmless error anal-

